**PLANNING FOR PEOPLE COALITION, an Unincorporated Association, et al., Plaintiffs,**

v.

**The COUNTY OF DuPAGE, ILLINOIS, et al., Defendants.**

No. 71 C 587.

United States District Court, N. D. Illinois, E. D.

Feb. 4, 1976.

**40**

R. Dickey Hamilton, Julie H. Friedman of DeVoe, Shadur & Krupp, Chicago, Ill., for plaintiffs.

Roger J. Kiley, Jr., Chicago, Ill., for Elmhurst-Chicago Stone Co. and Woodlane Corp.

Eugene A. Bradtke, Chicago, Ill., for St. Procopius College and Abbey.

Roger B. Harris of Altheimer & Gray, Chicago, Ill., for Hatch Farm Partnership.

Lawrence Gunnels of Kirkland & Ellis, Chicago, Ill., for County of DuPage and Members of the DuPage County Bd.

## MEMORANDUM OPINION

WILL, District Judge.

This is an action brought by ten named individual plaintiffs, for themselves and as representatives of low and moderate income persons for whom there is allegedly inadequate housing in DuPage County, and by two community organizations, to enjoin alleged exclusionary housing practices of the defendants, DuPage County, Illinois, its supervisors, and several large land developers who have built or are planning to build in the county. Discovery has been completed in the case, and it is on the final pretrial calendar. The defendants have now moved for summary judgment, contending that the recent Supreme Court decision in *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), requires us to dismiss the case because the individual and organizational plaintiffs lack standing. We grant defendants' motion as to Planning for People Coalition, but deny the motion as to the other plaintiffs.

## I. THE FACTS

In March, 1971, the plaintiffs commenced this action, alleging that low and moderate income persons are unable to obtain adequate housing in DuPage County because of the defendants' exclusionary housing practices. Relying on state and federal eligibility requirements for public or subsidized housing, they define "low income person" as a member of a family of five whose income is no greater than $5,800 a year and "moderate income person" as a member of a family of five whose income is no greater than $11,680. All other persons they designate as "relatively wealthy." The ten named plaintiffs are either low or moderate income persons, most of whom are members of minority groups and include both residents and nonresidents of DuPage County.[1] They allege they have sought adequate housing for their families in DuPage County, but have been unable to obtain housing which they can afford. The organizational plaintiffs, Planning for People and H.O.P.E., Inc., promote low and moderate income housing in DuPage County. Both organizations receive requests from such families for housing and attempt to assist them.

1. Eleanor Wyzykowski, a white resident of DuPage County, has three children and receives approximately $3,168 a year from public aid. Jose and Julia Eliondzo are Mexican-American residents of DuPage County, have nine children, and have an annual income of approximately $5,200 a year. Rubin and Ofelia Ramos also are Mexican-American residents of DuPage County, have seven children, and have $12,000 yearly income. Gerald and Anita Jones, black residents of DuPage County, have three children and have a yearly income of approximately $11,500. Corrine Winds is a white resident of Cook County who has three children and receives $2,976 a year from public aid. Cherry Jackson, a black resident of DuPage County, has four children and receives approximately $4,200 a year in public aid. Yvonne Herring is a black resident of Cook County, who has six children and has an annual income of approximately $8,000 a year.

In addition, H.O.P.E., Inc., is assisting a number of its Directors who are low or moderate income persons, in obtaining adequate housing in DuPage County.

The defendants in this action are DuPage County, its supervisors, and various parties who have interests in proposed residential developments in DuPage County. ("Green Trails" and "Realcoa" defendants.)[2] DuPage County is a political subdivision of the State of Illinois whose population is 492,000, of whom approximately 1,650 are black. In 1969 and 1970, the Green Trails and Realcoa defendants petitioned the County for special use permits to develop projects involving a total of approximately 2,494.5 acres, over 15,636 housing units, and an estimated population of over 34,-380 persons. The plaintiffs allege the County has approved or will approve permits for these projects, no units of which will be economically viable for either middle or low income families.

The plaintiffs contend that DuPage County officials intentionally attempt to exclude black and low or moderate income persons from the County and that developers, including the Green Trails and Realcoa defendants, have conspired with the County to maintain these exclusionary housing practices. The individual plaintiffs allege that these actions violate their constitutional rights of equal protection and freedom of residence and travel, and the organizational plaintiffs contend that they are representing those persons whose rights have been violated. Planning for People Coalition also asserts the rights of its DuPage County members "to live in an unsegregated DuPage County where they can send their children to racially and economically integrated public school facilities and otherwise make use of similarly integrated public facilities."

2. St. Procopius College and Abbey, Elmhurst-Chicago Stone Company, the Hatch Farm Partnership, Paul W. Hoffman, James V. Oliver, Ada M. Oliver, and the Woodlane Corporation have an interest in the "Green Trails" project.

More specifically, plaintiffs allege that DuPage County intentionally discourages developers from building low or moderate income housing in the County. They contend that, since the County's zoning ordinance does not permit the construction of any multifamily dwellings unless the County issues a special use permit, and since low or moderate income housing cannot be built except in multifamily dwellings, a developer must apply to the County before building such housing. The plaintiffs allege that County officials, by making public statements discouraging the entrance of blacks and low or moderate income families into the County, by seeking assurances from developers at zoning hearings that their proposed housing will exclude such families, and by advocating, in informal contacts with developers, the building of housing only for the relatively wealthy, deter developers from applying for special use permits to build low and moderate income housing. Because of these practices, plaintiffs argue, developers, aware of the desires of the County and of the high cost of making applications for development permits, refrain from proposing law or moderate income housing in DuPage County.

Furthermore, plaintiffs allege that developers have conspired with the County to exclude low and moderate income housing. Plaintiffs contend that developers cooperate with the County's housing practices, not only to comply with the wishes of County officials, but also to exploit the economic opportunities of an exclusionary housing market in the Chicago metropolitan area.

## II. ANALYSIS OF WARTH v. SELDIN

Defendants contend that the Supreme Court decision in *Warth v. Seldin, supra,*

The third developer defendant, Triangle Realty Corporation, has previously been dismissed from the suit.

requires us to dismiss this case because the plaintiffs do not have standing to bring it.

In *Warth*, individual and organizational plaintiffs from the Rochester, New York metropolitan area, claimed that the Penfield, New York zoning ordinance, by its terms and as enforced, excluded low and moderate income persons from living in the town. The plaintiffs included low and moderate income nonresidents who wanted to move into Penfield, and an organization which alleged that its Penfield members had been deprived of living in a racially and ethnically integrated community. The plaintiffs alleged that the town zoning ordinance allocated 98 per cent of Penfield's vacant land to single-family detached housing; that it imposed unreasonable requirements relating to lot size, set back, floor area, and habitable space which increased the cost of housing; that only 0.3 per cent of the land available for residential construction was allocated to multifamily structures, and that

> "in furtherance of a policy of exclusionary zoning, . . . the defendant members of Penfield's Town, Zoning, and Planning Boards had acted in an arbitrary and discriminatory manner: they had delayed action on proposals for low- and moderate-cost housing for inordinate periods of time; denied such proposals for arbitrary and insubstantial reasons; refused to grant necessary variances and permits, or to allow tax abatements; failed to provide necessary support services for low- and moderate-cost housing projects; and had amended the ordinance to make approval of such projects virtually impossible. *Warth v. Seldin*, at 495–96, 95 S.Ct. at 2203.

The defendants contended that both the individual and organizational plaintiffs lacked standing to bring the suit and the Supreme Court, 5–4, agreed.

■ Mr. Justice Powell, for the majority, initially examined the underlying theory of standing in the federal courts.

He observed that the law of standing involves both constitutional and prudential limitations on the exercise of federal court jurisdiction. The constitutional limitations, arising from the Article III requirement that the plaintiff must make out a case or controversy, require the plaintiff to allege "such a personal stake in the outcome of the controversy to warrant *his* invocation of federal court jurisdiction." *Warth v. Seldin*, at 498, 95 S.Ct. at 2205.

■ Stated in another way, this limitation requires the plaintiff to allege that he would benefit personally "in a tangible way from the court's intervention." *Warth v. Seldin*, at 508, 95 S.Ct. at 2210. The prudential limitation, involving considerations of judicial self-governance, bars standing for a plaintiff who alleges an "abstract" injury: a generalized grievance shared by a large class of citizens or an injury not sustained by the plaintiff, but by third parties.

■ Justice Powell then set forth the approach a district court should follow in determining if the plaintiff has standing. He stated that the court must accept as true all material allegations in the complaint and must construe the complaint in favor of the plaintiff. The court, however, may require the plaintiff to amend his complaint or to supply affidavits to support standing. Although not specifically stated, the approach in *Warth* indicates that the district court should also look beyond the broad conclusory allegations of the complaint and should scrutinize the particular alleged facts to determine if they suggest a personal injury to the plaintiff which could be remedied by Court intervention.

### A. *Individual Plaintiffs*

■ After the preliminary observations concerning the approach to standing issues, the Court applied this theory to the facts of the *Warth* case. In so doing, the Court suggested the type of analysis which should be made in deter-

mining whether an individual or organizational plaintiff, alleging exclusionary housing practices, has standing. As to the standing of individual plaintiffs, the Court must determine if the allegations demonstrate that the challenged housing practices harm them.[3] In other words, plaintiffs must allege facts from which it could be reasonably inferred that, absent the defendants' restrictive housing practices, there is a substantial probability that plaintiffs could live in the community. *Warth v. Seldin*, at 504, 95 S.Ct. 2197. This personal injury can be alleged in two possible ways. First, the plaintiff can allege direct injury to his personal interest in land. If the plaintiff is a landowner or developer, for example, an allegation that the defendant community denied him a requested variance for low income housing would meet the Article III standing requirements. Second, the plaintiffs can allege indirect injury if the community's housing practices have precluded builders or developers from constructing low income housing and that the precluded housing would have been suitable to their needs and at a price they could afford. The *Warth* Court cautioned that plaintiffs alleging indirect injury may have difficulty proving it and noted that in those previous cases in which courts have found standing for low income plaintiffs challenging exclusionary housing practices, the alleged injury concerned particular projects that would have supplied "housing within [the plaintiffs'] means, and of which they were the intended residents." *Warth v. Seldin*, at 507, 95 S.Ct. at 2209. The Court observed, however, that the required allegation of specific harm from the indirect injury does not necessitate the showing of a contractual interest in a particular project.

*Warth v. Seldin*, at 508 n. 18, 95 S.Ct. 2197.

Applying this analysis to the facts in *Warth*, Justice Powell determined that the individual plaintiffs lacked standing. First, he found that the plaintiffs did not allege direct injury. They did not have a present interest in any Penfield property; none of them was subject to the zoning ordinances' strictures, nor did the town ever deny any plaintiff a variance or special permit. *Warth v. Seldin*, at 504, 95 S.Ct. 2197. Second, Justice Powell found that the individual plaintiff's factual allegations did not concretely show any indirect injury to them. He noted that the plaintiffs did not demonstrate that they were members of a specifically injured class. The complaint did not define the term "low and moderate income," and the record disclosed wide variations in housing needs and income among the plaintiffs. *Warth v. Seldin*, at 494–95, n. 5, 95 S.Ct. 2197. Furthermore, Justice Powell observed that, even though the plaintiffs alleged that the town had rejected two proposed low and moderate income developments, the record did not show whether these projects would have met plaintiffs' needs at a price they could afford. Examining the factual allegations concerning the housing needs and income of the plaintiff, Justice Powell remarked that the plaintiffs' inability to live in Penfield was probably not the result of discriminatory housing practices, but rather was "the consequence of the economics of the area housing market." *Warth v. Seldin*, at 505–506, 95 S.Ct. at 2218.

### B. *Organizational Plaintiffs*

As to organizational plaintiffs, Justice Powell held that an association

---

3. For example, the Court examined the resources and housing needs of the individual plaintiffs and the descriptions of proposed projects in Penfield and determined that the plaintiffs probably did not have the resources to obtain housing in the projects and the projects would probably not meet their housing needs. The Court thus held that "petition-

ers' descriptions of their individual financial situations and housing needs suggest . . . that their inability to reside in Penfield is the consequence of the economics of the area housing market, rather than of respondents' assertedly illegal acts." *Warth v. Seldin*, at 506–507, n. 16, 95 S.Ct. at 2209.

may have standing if it alleges injury to itself or if it alleges "that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth v. Seldin*, at 511, 95 S.Ct. at 2211. Examining the claims of Metro-Act, the organization alleging injury to its Penfield members who were deprived of living in an integrated community, Justice Powell held that it lacked standing. He first noted that Metro-Act did not assert on behalf of its members a cause of action under section 804 of the Civil Rights Act of 1968, 42 U.S.C. § 3604, since it did not allege purposeful racial or ethnic discrimination.[4] *Warth v. Seldin*, at 513 n. 21, 95 S.Ct. 2197. He then held that, apart from this section, the Penfield members had not alleged a deprivation of any constitutional rights under 42 U.S.C. § 1983 and were attempting in actuality to litigate the claims of those low income families excluded from Penfield. Relying on the prudential limitations of the law of standing, Justice Powell ruled that these members lacked standing because they were "raising putative rights of third parties." *Warth v. Seldin*, at 514, 95 S.Ct. at 2213.

## III. APPLICATION OF WARTH v. SELDIN

### A. *Individual Plaintiffs*

Applying the *Warth* approach to the claims of the individual plaintiffs in this case, the first issue is whether or not the plaintiffs have alleged direct injury. As in *Warth*, the plaintiffs in this case have alleged no direct injury to an interest in land. They are not developers, nor have they applied to the County for a special use permit to construct low or moderate income housing. Thus, the individual plaintiffs do not have standing based on alleged direct injury to themselves.[5]

The second question is whether these plaintiffs have standing because they have sustained indirect injury. Similar to *Warth*, the plaintiffs in this case have not alleged that the county has denied a special use permit for a proposed project in which plaintiffs could have lived.[6] Unlike those in *Warth*, the plaintiffs in this case have defined the class which allegedly was injured—low and

---

4. This section provides:

"... it shall be unlawful—

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise making unavailable or deny, a dwelling to any person because of race, color, religion, sex, or natural origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin."

In *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) the Supreme Court held that this section gave residents of housing facilities covered by it a right to be free from the adverse consequences of discriminatory practices directed toward others. Thus, the Court held that the plaintiffs, who alleged they had lost the social benefits of living in an integrated community, had standing. See Part III, B, *infra*.

5. If the allegations of the complaint have any substance in fact, it is highly unlikely that a plaintiff who has been directly injured will ever exist since any developer of low or moderate income housing would face expensive litigation and extensive delay which would discourage any but a crusading developer (of whom there are very few) from becoming involved in such a project in DuPage County. This potential category of plaintiffs is obviously more theoretical than real.

6. If, as previously discussed, it is highly unlikely that there will be developers of low or moderate income housing seeking zoning variations and building permits in DuPage County, it will be equally unlikely that plaintiffs will ever exist who can allege that the denial of a permit effected a proposed project in which they could have lived. As a result, this potential category of plaintiffs is also more theoretical than real.

moderate income persons—and each of the individual plaintiffs falls within this definition.

Furthermore, the plaintiffs in this case, unlike the plaintiffs in *Warth*, have alleged a conspiracy between the County and developers. This conspiracy allegedly results in developer cooperation with the exclusionary zoning practices of DuPage County. Plaintiffs allege that the County, in a number of ways, intentionally indicates to developers that they should not file applications for special use permits to build low or moderate income housing. First, County officials allegedly make public statements discouraging the building of such housing in the County. For example, when the city of Wheaton proposed a public housing project, the County Board requested Wheaton officials to make separate applications for housing for senior citizens and for low and moderate income families, stating that they were "attempting to discourage low and moderate-income housing projects from getting a start in the County." Likewise, the County Collector and Treasurer wrote an article in the *Chicago Tribune*, stating that

> Low income housing in DuPage County is like buying a case of cancer. It would result in too many people with too little tax revenue to pay for the services . . . needed by these people. . . . Low income housing will help destroy the now eroding suburban tax base.

Forty thousand copies of this article were reproduced at County expense. It was posted on his office wall and was distributed with a survey questionnaire throughout the County. Second, plaintiffs assert that the County officials administer the zoning laws to persuade developers to propose projects only for the relatively wealthy. The County, for example, seeks assurances from developers that the proposed sale and rental prices will be high; that tax revenues derived from proposed developments will at least equal the cost of supplying public services; that the value of nearby property

will not be adversely affected, and that the projects will be restricted to the "right kind" of people. Third, County officials allegedly have informal contacts with developers in which they discourage the construction of low and moderate income housing. Plaintiffs contend that, as a result of these activities, developers, sensitive to the wishes of County officials, cooperate with the County's exclusionary housing policies and practices. Furthermore, they assert that developers cooperate with the County because they benefit economically from the exclusionary housing market. For example, one of the studies prepared for one of the Green Trails defendants, states that:

> "[a] factor which will continue to contribute to the migration of families from the central city and elsewhere to the suburban areas is the increasing number of nonwhites in Chicago."

Plaintiffs suggest that the developers, including the defendant developers, have taken advantage of this flight from the city to their economic advantage.

The basic question, therefore, is whether the alleged conspiracy in this case distinguishes it from *Warth*. Although Justice Powell indicated that the plaintiff does not have to allege a present contractual interest in a particular project to acquire standing, he did hold that the plaintiff "must allege facts from which it reasonably could be inferred that, absent the respondents' restrictive [housing] practices, there is a substantial probability that they would have been able to purchase or lease" in the community. *Warth v. Seldin* at 504, 95 S.Ct. at 2208. In this case, unlike in *Warth*, the plaintiffs have at least defined the classes which could be helped by an adjudication in their favor. Nevertheless, as in *Warth*, the plaintiffs have not alleged that the County rejected a proposed project in which they could have lived. The difference in this case is that the major reason plaintiffs cannot make such an allegation is the alleged conspiracy between the develop-

ers and the county. Whereas the plaintiffs in *Warth* had the possibility, though remote, of persuading a developer to propose housing which would meet their needs and then bring an action after disapproval by Penfield, the plaintiffs in this case, if their allegations are true and if developers continue to cooperate and conspire with the County, will never be able to acquire standing. Thus, if we held that the plaintiffs in this case have no standing merely because they have not alleged a personal interest in a proposed project, we would be holding that plaintiffs will have less possibility to acquire standing the more effective and complete the alleged conspiracy and discrimination. This would be a rewarding of combined racial and economic discrimination which *Warth* specifically eschews.

Thus, since the alleged conspiracy prevents plaintiffs from alleging a personal interest in a specific proposed development, we must scrutinize the facts to determine if we can infer that, absent the County's housing practices and the conspiracy between the developers and the County, there is a substantial probability that housing would be available to the plaintiffs in DuPage County which would be adequate for their needs and at a price they could afford. The alleged facts refer specifically to acts of the County which exerted great pressure on developers to persuade them to refrain from proposing low and moderate income housing projects. Furthermore, it is alleged that developers complied with the County's policies and hoped to benefit economically from the exclusionary housing market. The efforts by the County, and compliance by the developers, indicate that they believed that without such concerted efforts, there was a substantial probability that low and moderate income housing would be built in DuPage County. The record is devoid of any evidence indicating that this was an incorrect belief. Thus, we infer from the extent of these activities that, absent the alleged discriminatory

housing practices of the County and the developers, plaintiffs would have had a substantial probability of acquiring adequate housing which they could have afforded.

It can be argued that the Court in *Warth* could have drawn a similar inference that the town's discriminatory conduct indicated that, absent these practices, the plaintiffs could have acquired adequate housing in Penfield. This argument is without merit because the record in *Warth*, as described by Justice Powell, does not indicate that Penfield's exclusionary zoning practices were as pervasive as those alleged in this case. Mr. Justice Powell, examining the record in *Warth*, concluded that the plaintiffs' inability to reside in Penfield, a single, relatively small community, was not caused by the town's illegal acts, but rather by the "economics of the area housing market." Scrutinizing the record in this case, we find that the alleged activities of the County discouraging low and moderate income housing could well have caused the plaintiff's inability to reside anywhere in all of DuPage County, a substantial geographic area.

It cannot be seriously contended that, absent a conspiracy between county officials and developers as alleged, the economics of housing in an entire county which contains both rural and urban areas, would normally preclude any low or moderate income housing from being built anywhere in the county. If the sine qua non of *Warth* is that the plaintiffs there were excluded from Penfield only by virtue of economic discrimination and, therefore, could allege no constitutional deprivation, the decision has application only to small, homogeneous towns or communities, since, as indicated, in no area of any size could it be true that economics alone would prevent construction of low or moderate income housing. Moreover, in the instant case, plaintiffs specifically allege that the conduct of defendants is racially motivated for the

purpose of excluding all but "the right kind of people." Finally, it is alleged and undisputed that the city of Wheaton was prepared to build low cost public housing in DuPage County and the County officials discouraged it.

While it may be argued that our holding will allow any plaintiff to avoid the decision in *Warth* by alleging a conspiracy between the community and developers, it is important to recognize conversely that requiring a plaintiff to allege a personal interest in a specific proposed project in order to have standing would permit communities, counties, and theoretically, even states, to discriminate racially through economic exclusion by conspiring with developers never to propose any low or moderate income projects, a result clearly contrary to *Warth*. This dilemma can only be avoided by adopting the approach of Justice Powell in *Warth*. He suggests that a court should scrutinize the facts in the record in each case to determine if a cause and effect relationship exists between the alleged housing practices and the plaintiffs' inability to reside in the community.

■ At this stage of these proceedings, the record is, of course, incomplete. On the basis of the pleadings and such portions of the discovery as have been brought to our attention, however, we conclude that plaintiffs, by defining "low and moderate income persons," have alleged injury to two classes of individuals who could be granted relief by this Court if the allegations of the complaint are proven; that they have alleged facts indicating an intentional effort by the County to exclude low and moderate income persons from the County and thereby preclude blacks and other minorities from residing in DuPage County in any substantial numbers; that they have alleged facts indicating a conspiracy between the County and developers to accomplish this exclusion; and, finally, they have alleged facts establishing that, absent such a conspiracy, low or moderate income housing which they and other

members of the two classes of "low" and "moderate" income persons would use and could afford would be built somewhere in DuPage County. Based on these allegations, we hold that the individual plaintiffs have standing to bring this action.

### B. *Organizational Plaintiffs*

■ Using the *Warth* approach in regard to the claims of H.O.P.E., Inc., we hold that it also has standing. In *Warth*, Justice Powell held that an association has standing only if it alleges injury to itself or to its members or any one of them. In this case, since H.O.P.E., Inc. alleges that a number of its directors are low or moderate income persons who are actively seeking adequate housing in DuPage County, it has standing to litigate their claims.

Concerning the claims of Planning for People Coalition, it alleges only one injury to its members: its DuPage County members are deprived of the benefits of living in an integrated community by the County's exclusionary housing practices. In *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), the Supreme Court held that section 804 of the Civil Rights Act of 1968 (the Act), 42 U.S.C. 3604, gave residents of housing facilities covered by the Act a right to be free from the adverse consequences of discriminatory practices directed toward others. The Court found that tenants in an allegedly segregated apartment complex were "persons aggrieved" under the provisions of section 804 and thus had standing to claim the loss of the social benefits of living in an integrated complex. In *Warth*, one of the organizational plaintiffs alleged that its Penfield members were denied the benefits of living in a racially and economically integrated community by the town's zoning practices. The Court held that section 804 only created a cause of action against alleged "purposeful racial or ethnic discrimination," and found that this organizational plaintiff, not having al-

leged such discrimination, had no standing to claim that its members were deprived of living in an integrated community. *Warth v. Seldin*, 422 U.S. at 513 n. 21, 95 S.Ct. 2197. The Court expressed no view as to whether it would have had standing if it had alleged such discrimination.

■ Although in this case, unlike *Warth*, the plaintiffs have alleged that the county's practices are racially motivated, we hold that Planning for People Coalition does not have standing. Section 804 refers to discrimination in regard to a "dwelling," which is defined in section 802 of the Act, 42 U.S.C. § 3602, as

"any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof."

This language indicates that a county's discriminatory housing practices are violations of the Act only if they are directed toward particular projects or proposed developments. See *Park View Heights Corp. v. City of Black Jack*, 467 F.2d 1208 (8th Cir. 1972). In this case, since Planning for People Coalition does not allege that the defendants' practices barred the development of a particular project, we hold it does not have standing.

Requiring Planning for People Coalition to allege either discrimination to its members which bars them from obtaining housing in DuPage County or discrimination directed toward a particular project is not inconsistent with our conclusions regarding the dilemma of the individual plaintiffs, since they allege different causes of action. The individual plaintiffs, in this case, have alleged

that defendants' practices precluded them from obtaining adequate housing in DuPage County. They have alleged a cause of action against the defendants under 42 U.S.C. §§ 1981, 1982, 1983 and 1985(3). Since none of these sections requires that a plaintiff allege discrimination in regard to a particular housing project, the individual plaintiffs have standing although they do not allege discrimination directed toward a specific development. On the other hand, Planning for People Coalition alleges that defendants' practices have injured its DuPage County members by depriving them of the benefits of living in an integrated community. In *Warth*, Justice Powell held that such deprivations are not "judicially cognizable" injuries unless section 804 is applicable. *Warth v. Seldin*, 422 U.S. at 513–14, 95 S.Ct. 2197. Since this section requires allegations of discrimination directed toward a particular development and since Planning for People Coalition makes no such allegations, it has not stated a "judicially cognizable" cause of action and thus does not have standing.

## IV. CONCLUSION

In accordance with the above, we conclude that the individual plaintiffs do have standing since they assert that, absent the alleged activities of the County and the developers, they would have been able to obtain adequate housing in DuPage County. Furthermore, we hold that H.O.P.E., Inc., has standing because members of its Board of Directors are low and moderate income persons who have sought and desire housing in the County. Finally, we conclude that Planning for People Coalition, by not alleging injury to its members in relation to housing under 42 U.S.C. § 3604, does not have standing.

An appropriate order will enter.