Julio **HUERTAS**, Carmen Melendez, Francisco Garcia, Rosaria Esperon, Raphael Negron, Angelo Vasquez, Maria Sanchez, Joyce Johnson, and Betty Robinson, Individually and on behalf of all other persons similarly situated, and the Lower East Side Joint Planning Council on Housing, and It's Time, Inc., Plaintiffs,

v.

**EAST RIVER HOUSING CORP.**, Seward Park Housing Corp., Hillman Housing Corp., Amalgamated Dwellings, Inc., Ralph Lippman as President and a member of the board of directors of East River Housing Corp., President of Hillman Housing Corp., and President of Amalgamated Dwellings, Inc., and Harold Ostroff, as President and a member of the board of directors of Seward Park Housing Corp., Inc., Defendants.

No. 77 Civ. 4494 (RLC).

United States District Court,
S. D. New York.

Feb. 13, 1979.

Puerto Rican Legal Defense & Ed. Fund, Inc., New York City, for plaintiffs; Jorge L. Batista, Robert Hermann, Kenneth Kimerling, and Barbara L. Schulman, New York City, of counsel.

Szold, Brandwen, Meyers & Altman, New York City, for defendants; Alan G. Blumberg, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

The plaintiffs in this case are two community organizations and a number of indi-

viduals who allege that the defendants have engaged in a pattern of racial and ethnic discrimination in the sale of cooperative apartments. The defendant housing corporations and corporate officers (collectively referred to here as "East River Housing") have moved to dismiss the claims of the organizational plaintiffs, It's Time, Inc. ("It's Time") and the Lower East Side Joint Planning Council on Housing ("JPC"), on the ground that they lack standing. At the time that the court certified this lawsuit as a class action, decision on defendants' motion regarding standing was reserved.[1] For the reasons that follow the court now holds that the plaintiff organizations have standing, and defendants' motion is denied.

*Background*

East River Housing operates a number of cooperative apartment buildings in the Lower East Side of Manhattan, an area roughly defined by plaintiffs as bounded by Fourteenth Street on the north, the East River on the east, the southern tip of Manhattan, and Broadway. The gravamen of the complaint is that East River Housing has discriminated against black and Hispanic persons in the allocation of apartment units.[2] Defendants have allegedly perpetrated this discrimination by refusing to sell apartments to minority applicants, by discouraging minority applicants from completing the application process, and by selling apartments primarily to the friends and relatives of current tenants who are predominantly white. The named plaintiffs represent two subclasses of claimants: (1) black and Hispanic individuals who actually filed applications and have not been sold an apartment, and (2) minority persons who were discouraged from applying by their knowledge of East River Housing's allegedly discriminatory policies. The plaintiffs assert that the policies of East River Housing violate both the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982.

Defendants have strenuously denied plaintiffs' allegations. They assert that they have never withheld an application form from any person nor refused to sell any apartment on the basis of the applicant's race or ethnicity. East River Housing suggests that the plaintiffs' attempts to secure housing have met with frustration because most of the plaintiffs are seeking scarce three-bedroom apartments which are allocated on a priority basis to current tenants who wish to move into these larger units.[3]

The first organizational plaintiff, It's Time, is a not-for-profit New York corporation established for the purpose of aiding low income persons in locating housing. Toward this end, It's Time participates in tenant selection procedures in public and federally-subsidized housing projects, advertises available housing, and assists applicants in completing the required forms. According to affidavits submitted by the plaintiffs, several members of It's Time have been excluded from buying cooperative housing because of East River Housing's policies, and others have been discouraged from applying.[4] This has purportedly interfered with the ability of It's Time to perform its stated role. It's Time further alleges that defendants' policies have deprived its members of the benefits of living in integrated housing.

JPC is an umbrella organization whose members are representatives of numerous

---

1. Order of the court, dated March 6, 1978.

2. Although referred to here as a "sale" for the sake of brevity, each transaction is actually a simultaneous sale of cooperative shares and execution of an apartment lease.

3. Defendants previously moved for summary judgment against those plaintiffs who had applied for three-bedroom apartments on the ground that no such apartment has been available to any non-resident applicant since 1973, and plaintiffs therefore could not possibly have been discriminated against on the basis of race or ethnicity. By order of the court dated March 6, 1978, defendants' summary judgment motion was denied without prejudice with leave to renew after there has been a complete opportunity for pre-trial discovery.

4. Affidavit of Amparo Tirado, Associate Director of It's Time, Inc.

Lower East Side community groups. Like It's Time, JPC's primary goal is to obtain housing for low income persons in this section of New York City.[5] JPC participates in tenant selection processes and lobbies governmental units to obtain funding for low income housing. It is alleged that some of JPC's members, including the chairman who is a named plaintiff, have been denied the opportunity to buy apartments in the defendants' buildings on account of race or ethnicity or have been deterred from applying because of East River Housing's policies. JPC's members have allegedly been prevented from living in integrated buildings, and the organization claims that it has been thwarted in the accomplishment of its goals by the defendants' discriminatory policies.

*Legal Framework*

■ The question of whether a litigant has standing to raise a claim "involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The constitutional constraint is dictated by the Article III requirement that courts take jurisdiction only over cases and controversies. To overcome this first hurdle, a plaintiff must have " 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin, supra,* at 498–99, 95 S.Ct., at 2205, *quoting Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

Courts have designated this requisite element the "injury in fact" requirement. But it is critical to understand that the injury need not constitute a violation of the plaintiff's own legal rights. For example, a white who is prohibited by law from selling his home to a black suffers no legal wrong; only the rights of the potential purchaser

have been violated. Nevertheless, the white plaintiff's loss of a sale constitutes harm to him sufficient to meet at least the constitutional test for standing. *See Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 237, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); *Barrows v. Jackson,* 346 U.S. 249, 259–60, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953).

■ Numerous types of harm have been held to be adequate precursors to a grant of standing. The mere loss of aesthetic pleasure, for instance, is enough to meet the injury in fact requirement. *Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Of course, more mundane injuries such as economic loss are also sufficient. Indeed, the government can "create" injury in fact by establishing a legal right the deprivation of which in itself constitutes harm to the victim. *Warth v. Seldin, supra,* 422 U.S. at 500, 95 S.Ct. 2197; *Linda R. S. v. Richard D.,* 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973); *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 212, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) (White, J., concurring).

■ For purposes of the constitutional limitation, the magnitude of the harm involved is of little significance. *See United States v. SCRAP,* 412 U.S. 669, 683–90, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (student organization alleging potential injury to environment because of effect of railroad rates on recyclable commodities accorded standing). It is important, however, that the plaintiff be able to demonstrate a direct causal relationship between an injury he suffered and an alleged violation of law. *Compare Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 43–46, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1975) (welfare recipients unable to show that tax treatment affected delivery of services to poor by hospitals have no standing to challenge that tax policy) and *Linda R. S. v. Richard D., supra,* 410 U.S. at 617–18, 93 S.Ct. 1146 (mother of illegitimate child has no standing to challenge failure to prose-

---

**5.** Affidavit of Rosaria Esperon, Chairman of the Lower East Side Joint Planning Council on Housing.

cute father for non-support where no proof that prosecution would result in support to plaintiff) *with United States v. SCRAP, supra,* 412 U.S. at 688–90, 93 S.Ct. 2405 (though line of causation "attenuated," complaint could not be dismissed without demonstration that plaintiffs unable to support their allegations). *See also* Tushnet, *The New Law of Standing: A Plea for Abandonment,* 62 Cornell L.Rev. 663, 681–88 (1977). Unless a plaintiff can demonstrate a relationship between the legal remedy requested and relief from the injury asserted, he will not be accorded standing.

■ Two prudential considerations further limit the class of litigants who will be accorded standing. First, a plaintiff may not base his claim on an abstract grievance "shared in substantially equal measure by all or a large class of citizens." *Warth v. Seldin, supra,* 422 U.S. at 499, 95 S.Ct. at 2205; *Resident Advisory Bd. v. Rizzo,* 425 F.Supp. 987, 1010–11 (E.D.Pa.1976); *Planning for People Coalition v. County of Du-Page,* 70 F.R.D. 38, 42 (N.D.Ill.1976). The thrust of this rule cannot be that the injury suffered must be severe and limited to a few individuals, since the Supreme Court has said that "standing is not to be denied simply because many people suffer the same injury." *United States v. SCRAP, supra,* 412 U.S. at 687, 93 S.Ct. at 2416.[6] *See also Warth v. Seldin, supra,* 422 U.S. at 501, 95 S.Ct. 2197. Rather, plaintiffs must demonstrate that they have suffered some specific and perceptible harm that differentiates them from other citizens. This rule is derived from the broader principle that abstract, generally-shared complaints

should be addressed to the legislature and not to the courts.

■ The second prudential limitation is that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin, supra,* 422 U.S. at 499, 95 S.Ct. at 2205. Thus, even though the plaintiff has suffered palpable harm because some third party has been denied his legal rights, the plaintiff may not generally assert the third party's rights as the basis of his claim. There are, however, two exceptions to this limitation. First, when a violation of the third party's rights adversely affects a relationship that exists between that party and the plaintiff, the plaintiff can assert the third party's rights. *See, e. g., Sullivan v. Little Hunting Park, Inc., supra; Barrows v. Jackson, supra; United States General, Inc. v. City of Joliet,* 432 F.Supp. 346, 350 (N.D.Ill.1977). Second, just as Congress may create injury in fact by the establishment of substantive legal rights, so also may Congress, either explicitly or implicitly, grant a class of plaintiffs standing to assert the rights of third parties. *Warth v. Seldin, supra,* 422 U.S. at 501, 95 S.Ct. 2197.

■ These general principles are altered slightly when the plaintiff in question is not an individual but a membership association. Such an organization may have standing to assert the rights of its members in either a representative or a derivative role.[7] In its representative capacity, an organization may present its members' claims

---

**6.** Despite the fact that *Warth* clearly classifies the generality of a claim as a prudential consideration, other cases have treated generalized grievances as transgressing the constitutional limitations on the courts' jurisdiction. In *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974), and its companion case, *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), the Court found that the injuries complained of were in fact shared by all citizens and taxpayers, and thus the plaintiffs failed to demonstrate the requisite injury in fact. *See* Sedler, *Standing and the Burger Court: An Analysis and Some Proposals for*

*Legislative Reform,* 30 Rutgers L.Rev. 863, 870 (1977). Thus, at least with regard to the generality of a plaintiff's grievance, the distinction between constitutional limitations and prudential ones appears to be a question of degree.

**7.** Organizations also have standing to enforce whatever rights they themselves are entitled to. *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197 (1975). Thus, for example, a corporation has standing to assert that a law limiting corporate electioneering interferes with its right to communicate its views. *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978).

even if no injury in fact has been suffered by the organization itself. *Id.* at 511, 95 S.Ct. 2197.

> "So long as [the association's members are suffering immediate or threatened injury sufficient for them to bring suit in their own right], and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction."

*Id.* at 511, 95 S.Ct. at 2212. The allegation that even a single member of an organization has been injured can be sufficient, *id.* at 511, 95 S.Ct. 2197; *Local 194, Retail, Wholesale and Department Store Union v. Standard Brands, Inc.*, 540 F.2d 864, 867 (7th Cir. 1976); *Citizens Council on Human Relations v. Buffalo Yacht Club*, 438 F.Supp. 316, 322 (W.D.N.Y.1977), and representative standing may be granted notwithstanding the ability of the injured individuals to litigate their own claims. *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 342, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *United States General, Inc. v. City of Joliet, supra*, at 353; *Robinson v. Conlisk*, 385 F.Supp. 529, 539 (N.D.Ill. 1974).[8]

More uncertain is whether the organization's purposes need bear any relation to the rights of its members that it seeks to assert. Although the *Warth* opinion did not make explicit any such limitation, other cases granting standing have held that some nexus must exist between the organizational goals and the rights of the members that have been violated. *See*

*Robinson v. Conlisk, supra*, at 539. Recently, the Supreme Court confirmed the existence of such a requirement. In *Hunt v. Washington State Apple Advertising Comm'n, supra*, 432 U.S. at 343, 97 S.Ct. at 2441, it summarized the requirements for representational standing by saying:

> "[W]e have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit."

Thus, it is now clear that in addition to showing that at least one of its members has sustained injury, an organization must show that rectification of the harm is "germane" to organizational goals before it can assert the member's rights.

Derivative standing, unlike representative standing, requires that the organizational plaintiff itself have suffered injury in fact. Under such circumstances, the organization may assert the rights of its members, even if these rights do not correspond precisely with the nature of the injury sustained by the organization. *Warth v. Seldin, supra*, 422 U.S. at 511, 95 S.Ct. 2197; *Citizens Council on Human Relations v. Buffalo Yacht Club, supra*, at 322. However, it must be demonstrated that the injury to the members is related to their association with the plaintiff organization. *Warth v. Seldin, supra*, 422 U.S. at 511, 95 S.Ct. 2197; *Citizens Council on Human Relations v. Buffalo Yacht Club, supra*, at 322. In some cases this relation is direct, as

---

8. Justice Powell's suggestion in *Singleton v. Wulff*, 428 U.S. 106, 125–27, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (concurring in part and dissenting in part), that a plaintiff generally may not assert a third party's rights where the third party is at all capable of doing so himself does not contradict this conclusion. The plaintiffs in *Singleton* were physicians who sought to assert the rights of their patients to undergo abortions without complying with state-imposed restrictions. The patients were not joined as parties in that action, and the doctors were not acting as "representatives" of the legal interests of the patients, but rather were utilizing the patients' rights as a means of furthering their own interests. By contrast, individual members of organizational plaintiffs have been joined in the instant case, and the organizations' legal interests do not diverge from those of their members. Here, because the organizational plaintiffs have sued in a representative capacity, their standing must be tested against the standards of *Warth*, not against rules derived from cases like *Singleton*.

where the very ability of the members to remain part of the organization is threatened by the violation of their rights. *See, e. g., NAACP v. Alabama,* 357 U.S. 449, 458–69, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (disclosure of membership lists would have discouraged affiliation with civil rights organization). In other cases, however, organizations have been accorded standing where the injury that has been sustained by members merely frustrates the association's goals. *See, e. g., Heights Community Congress v. Rosenblatt Realty, Inc.,* 73 F.R.D. 1, 4 (N.D.Ohio 1975) (discriminatory acts of defendants alleged to interfere with goal of integration). Thus, the precise contours of derivative standing have not yet been defined.

In the instant case the organizational plaintiffs, It's Time and JPC, have asserted multiple grounds for standing. First, they have alleged that some of their minority members have been denied the opportunity to buy cooperative housing on the basis of race and ethnicity in violation of the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq.* and the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982. Second, the organizations claim that the rights of all their members as guaranteed by these same statutes have been violated because these members have been deprived of the opportunity to live in an integrated community. On the basis of these claimed violations, It's Time and JPC allege standing to sue in a representative capacity. Finally, the organizations claim that they themselves have suffered injury as a result of the defendants' discriminatory policies. They therefore contend that they can assert each of the foregoing claims of their members in a derivative capacity as well.

I conclude that It's Time and JPC have standing to raise the claims of their black and Hispanic members in a representative capacity under both the Fair Housing Act and the Civil Rights Act. Thus, there is no need to address the remaining grounds for standing suggested by the plaintiffs.

### Standing to Assert Direct Fair Housing Act Claims

 The plaintiffs have alleged that some of their black and Hispanic members have been discriminated against by the defendants on the basis of race or ethnic background. "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin, supra,* 422 U.S. at 501, 95 S.Ct. at 2206. Thus, since It's Time and JPC present allegations that would suffice to make out a cause of action if their members sued in their own right, the organizations may be accorded standing.

The first element in the three-part test for representative standing is the requirement that an organization's members have sustained injury in fact. Here there is no doubt that persons associated with the organizational plaintiffs have alleged cognizable injury. Discrimination in housing causes actual injury by depriving individuals of potential dwelling places and legal injury by depriving them of rights established by the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq.*[9]

It has also been satisfactorily established that the persons allegedly discriminated against include members of the plaintiff

---

9. The relevant portions of the Fair Housing Act of 1968 read as follows:

"[I]t shall be unlawful—

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin.

. . . . .

(d) To represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available."

42 U.S.C. § 3604.

organizations. Amparo Tirado, Lillian deJesus, and Rosaria Esperon have all submitted affidavits indicating that they are members of It's Time, and Tirado is associate director of that organization. Since It's Time is a not-for-profit corporation certified under the laws of New York, the meaning of "membership" therein is defined by statute. *See* Not-For-Profit Corporation Law, § 601 *et seq.* What constitutes membership in JPC is less clear, since this organization is apparently not an entity authorized by state law. It is rather a representative body made up of delegates of other Lower East Side groups. Nevertheless, sufficient "indicia of membership" seem to be present. *See Hunt v. Washington State Apple Advertising Comm'n, supra*, 432 U.S. at 344–45, 97 S.Ct. 2434. Tirado, who is a member of JPC, and Esperon, who is the chairman, allege that they became associated with JPC because they share the common goal of securing decent low income housing in their community. It is on behalf of these individuals who joined in the voluntary association that JPC has brought suit. Thus, the court need not reach the more difficult question of whether JPC could advance the claims of individuals who are not directly members of JPC, but who are merely represented by delegates to this umbrella organization.[10] The conclusion that JPC has standing is further supported by the fact that its chairman has alleged that she was a direct target of discrimination. *See Planning for People Coalition v. County of DuPage, supra*, at 47 (organization granted standing to represent directors whose civil rights were violated).

Plaintiffs have met the second standing requirement by demonstrating that the injury suffered by the members is germane to the purposes of the organizations. The alleged harm is racial and ethnic discrimination in housing. It's Time's certificate of incorporation explicitly states that that organization's purpose is "[t]o aid persons of low income to secure safe and decent housing accommodations . . . ."[11] Similarly, the purpose of JPC "is to secure integrated, decent, low and moderate income housing for members of the Lower East Side community."[12] These organizations, then, have even a more direct relation to the type of violation alleged here than would a general purpose civil rights group.

The third element of representative standing is the appropriateness of permitting a representative rather than the injured parties themselves to litigate the specific claims at issue. "[W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought." *Warth v. Seldin, supra*, 422 U.S. at 515, 95 S.Ct. at 2213. Here, the only relief sought is injunctive. Therefore, "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Ibid.* Since this is not a case where there are a variety of claimed injuries or where the relief is necessarily individualized, it is appropriate to accord standing to the plaintiff organizations. *See Local 194, Retail, Wholesale and Department Store Union v. Standard Brands, Inc., supra*, at 865.

It's Time and JPC thus fulfill all the requisites for standing to assert the claims of their members under the Fair Housing Act of 1968 according to the standards set forth in the most recent Supreme Court cases. Any doubt as to this conclusion is removed by *Trafficante v. Metropolitan Life Ins. Co., supra*, and its progeny. In *Trafficante* the Supreme Court endorsed

10. The Supreme Court has not yet addressed the question of how attenuated the membership connection may be before an organization can no longer represent the legal interests of individuals affiliated with it. An appropriate rule of thumb may be that the court should be more diligent in guaranteeing that a member's individual interests are protected when the membership ties are less direct. Here there is little difficulty ensuring such protection since members are closely linked to the plaintiff organizations and are named as individual plaintiffs.

11. Attachment to Affidavit of Amparo Tirado.

12. Affidavit of Rosaria Esperon.

the proposition that the Fair Housing Act of 1968 was intended to grant standing to all plaintiffs who would meet the constitutional requirements. *Id.* 409 U.S. at 209, 93 S.Ct. 364. The court acknowledged that at least § 810(a) of the Act, 42 U.S.C. § 3610, could only be given vitality if the standing provisions were given a "generous construction." *Id.* at 212, 93 S.Ct. 364. Although the *Trafficante* case itself dealt with individual plaintiffs, subsequent cases have applied the same general principles to organizations. In *Wheatley Heights Neighborhood Coalition v. Jenna Resales Co.*, 429 F.Supp. 486 (E.D.N.Y.1977), for example, the court granted standing to an association of residents challenging the practice of "steering" minority home seekers only to particular neighborhoods. Similarly, the court in *Fair Housing Council of Bergen County, Inc. v. Eastern Bergen County Multiple Listing Service, Inc.*, 422 F.Supp. 1071, 1083 (D.N.J.1976), found that an organization could represent members who had been affected by the discriminatory policies of realtors. The argument for granting standing to It's Time and JPC in the instant case is even stronger, since their members are not merely "affected" by the policies of the defendants, but are the direct objects of the alleged discrimination.[13]

## Standing to Assert Direct Civil Rights Act Claims

■ The considerations that lead to the conclusion that the organizational plaintiffs

have standing to raise the claims of their members under the Fair Housing Act apply with equal force to claims brought under the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982. The factual predicate underlying the plaintiffs' claims is the same in both instances. The only distinction lies in the particular legal rights asserted, and there is no doubt that discrimination on the basis of race in the sale or rental of housing constitutes a violation of the Civil Rights Act of 1866.[14] *See Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).

■ Defendants contend, however, that there is a strict rule in this circuit that denies standing to organizational plaintiffs that seek to raise claims of their members under the Civil Rights Act. They base this contention on an analysis of the opinion of the Second Circuit in *Warth v. Seldin*, 495 F.2d 1187 (2d Cir. 1974), and on the earlier case of *Aguayo v. Richardson*, 473 F.2d 1090 (2d Cir. 1973). Since the Second Circuit's decision in *Warth* was affirmed by the Supreme Court, the defendants' theory has some superficial appeal. However, the Supreme Court did not adopt the reasoning of the Court of Appeals in *Warth*, and, indeed, the Supreme Court's rationale in that case vitiates the general rule against representative standing suggested in *Aguayo*.

In *Warth*, various organizations and individuals in the city of Rochester brought suit

13. The question most extensively briefed by the parties—whether *TOPIC v. Circle Realty*, 532 F.2d 1273 (9th Cir. 1976) should be followed—has little direct bearing on the issue of representative standing. The *TOPIC* case held that whites had no standing under 42 U.S.C. § 3612 to challenge practices of realtors that kept minority individuals out of the plaintiffs' neighborhoods. The court found that in contrast to § 3610, § 3612 was designed exclusively to benefit the direct targets of discrimination. Here, however, the members of It's Time and JPC are alleging that they *are* the persons being discriminated against. The organizational plaintiffs are suing on their behalf, and not merely as private attorneys general or on behalf of the residents of white ghettos.

14. The relevant portions of the Civil Rights Act of 1866 read as follows:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981.

"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982.

against the adjacent town of Penfield, claiming that the town's zoning ordinance excluded low and moderate income persons in violation of their rights under the Civil Rights Act. Both the Second Circuit and the Supreme Court held that none of the putative plaintiffs had standing to maintain the lawsuit. For purposes of comparison with the instant case, two of the organizational plaintiffs in *Warth* are most relevant: Metro-Act of Rochester, Inc. ("Metro-Act") and Housing Council in the Monroe County Area, Inc. ("Housing Council").

Metro-Act, a non-profit corporation seeking to alleviate the housing shortage in Rochester, advanced a number of theories for standing. The courts found that Metro-Act could not maintain standing either as a taxpayer or as an organization with a special interest in housing matters. 422 U.S. at 512, 95 S.Ct. 2197; 495 F.2d at 1193. Similarly, Metro-Act was denied the opportunity to represent its low income members who lived outside Penfield because these individuals had not alleged that they had been denied housing there or that they were able to buy or construct housing in that area. Thus, they lacked the personal stake required before they could claim standing in their own right. 422 U.S. at 502–08, 95 S.Ct. 2197; 495 F.2d at 1191–93.

More relevant to the instant case is the fact that the Second Circuit also denied Metro-Act standing to represent its members who did live in Penfield. In so holding, the court distinguished *Trafficante v. Metropolitan Life Ins. Co., supra,* on the basis that that case was confined to claims brought under the Fair Housing Act. 495 F.2d 1193–94. Although the Supreme Court agreed with the result reached by the Second Circuit, it clarified the relation of *Warth* to *Trafficante.* The Court interpreted *Trafficante* as holding that the Fair Housing Act had created injury in fact for persons affected by housing discrimination even if they had not been the direct targets of the prejudice. 422 U.S. at 513–14, 95 S.Ct. 2197. Thus, in the absence of any claim of discrimination based on race or ethnicity violative of the Fair Housing Act, the members of Metro-Act had not alleged

sufficient injury in fact. The Court went on to say that even if injury in fact could be assumed, prudential considerations prevented a grant of standing to Metro-Act to represent its members who, though purportedly injured, had not been deprived of the constitutional rights enforceable through the Civil Rights Act. 422 U.S. at 514. The members had claimed discrimination on the basis of income, not intentional racial discrimination. *See* Berch, *Unchain the Courts—An Essay on the Role of the Federal Courts in the Vindication of Social Rights,* 1976 Ariz.St.L.J. 437, 448–49.

These considerations, both constitutional and prudential, are not present in the instant case. Here, it has been adequately alleged that the members of It's Time and JPC have directly sustained injury in fact and have been deprived of their own rights under the Civil Rights Act: the claimants aver that they have been discriminated against on the basis of race and ethnicity. Therefore, the considerations that led the Supreme Court to deny standing to Metro-Act are not operative here.

The second organizational plaintiff in *Warth,* Housing Council, was a non-profit corporation consisting of several groups interested in housing problems. This plaintiff rested one argument for standing on the fact that one of its members, Penfield Better Homes Corp. ("Better Homes"), had actually been denied approval of a specific housing project proposal. The Second Circuit rejected this contention, saying, "It is highly doubtful that an organization has standing to represent its members in most cases under the Civil Rights Act." 495 F.2d at 1194. The court reasoned that the special circumstances present in *NAACP v. Alabama, supra,* did not apply, and that in any event Better Homes was the only member of Housing Council to state a cognizable claim and should have asserted its own rights. 495 F.2d at 1194.

The Supreme Court, while reaching the same ultimate conclusion regarding Housing Council's lack of standing, rested its decision on strikingly different grounds.

Although recognizing that Better Homes had once been denied a building permit because of the challenged zoning regulations, the Court found that "neither the complaint nor the record supplies any basis from which to infer that the controversy between respondents and Better Homes, however vigorous it may once have been, remained a live, concrete dispute when this complaint was filed." 422 U.S. at 516–17, 95 S.Ct. at 2215. In so holding, the Supreme Court expressly left the door open for representative standing in civil rights suits where the requirement of a live case and controversy is met. The Court said, "It is therefore possible that in 1969, or within a reasonable time thereafter, Better Homes itself and possibly Housing Council as its representative would have had standing to seek review of respondents' action." *Id.* at 517, 95 S.Ct. at 2214.[15]

After the Supreme Court's decision in *Warth*, a blanket rule against representative standing in civil rights cases cannot stand. This conclusion is reinforced by an examination of the premises that supported *Aguayo v. Richardson, supra,* the case in which the Second Circuit alluded to such a rule. In *Aguayo* the court found no precedent suggesting that an organization could sue under the Civil Rights Act for violation of the rights of its members. *Id.* at 1099. It went on to propose that the possibility of representative standing raised in *Sierra Club v. Morton, supra,* should be confined to cases which, like *Sierra Club* itself, involve review of administrative decisions. *Id.* at

1100. *Warth* and the general statement of the principles of representative standing in *Hunt v. Washington State Apple Advertising Comm'n, supra,* have undercut the *Aguayo* analysis. First, there is no mention in either subsequent Supreme Court case that the principles of representative standing should be confined to a particular class of cases. *See Warth v. Seldin,* 422 U.S. at 511, 515, 517, 95 S.Ct. 2197; *Hunt v. Washington State Apple Advertising Comm'n, supra,* 432 U.S. at 342–44, 97 S.Ct. 2434. Second, the endorsement in *Warth* of representative standing was made in the context of a Civil Rights Act case. It would be surprising indeed if the Supreme Court chose to announce general principles of standing in the very case that would prove to be an exception to those rules. The premises upon which the *Aguayo* decision was based, then, are no longer viable in light of recent Supreme Court decisions.

*Conclusion*

Plaintiff organizations It's Time and JPC thus have standing to represent their members for violations of both the Fair Housing Act of 1968 and the Civil Rights Act of 1866. The members allege that their own rights were directly violated, and the organizational plaintiffs have shown an adequate nexus with their members to seek redress on their behalf. This conclusion renders it unnecessary to consider at this time the claims that these organizations also have standing because of injury to themselves[16]

---

**15.** It should be noted that the argument of the organizational plaintiffs for standing in the instant case is even stronger than the best argument that Housing Council could have made in *Warth.* Even if Better Homes' application for a building permit had not become stale, Better Homes would have been attempting to advance the constitutional rights of third parties: the potential tenants of the proposed project. In the instant case the members of It's Time and JPC are asserting their own rights.

**16.** Although there are a few situations where it is clear whether an organization itself has sustained injury, no general principles have been established that apply to all cases. At one extreme, an organization that alleges no more than an abiding interest in a problem cannot

claim injury when the problem is exacerbated. *See Sierra Club v. Morton,* 405 U.S. 727, 734–35, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). At the other extreme, where an organization suffers economic injury, as when an action impedes the organization's ability to collect assessments from its members, the organization will be granted standing. *See Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 345, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

The existence of a "financial nexus" between the wrong alleged and harm to the organization is certainly sufficient to create standing. *Ibid.* But such a nexus surely cannot be a necessary prerequisite. In the context of the instant case, there is no doubt that the organizational plaintiffs would have standing if they acted as paid

or because their members have been deprived of the general benefits of integrated housing.[17] The defendants' motion to dismiss the claims of the organizational plaintiffs is denied.

IT IS SO ORDERED.

referral agencies for low-income apartment seekers and lost profits because of racial discrimination in housing. The fact that the organizations provide identical services but do so without charge should not affect their claim to standing. The touchstone should not be remuneration, then, but rather the nature of the organization's function. If it merely monitors and perhaps publicizes a problem, it suffers no injury in fact when the problem worsens. If, however, the organization takes an active role in combatting a social ill, by, for example, the provision of services to clients, it may suffer injury in fact when relevant laws are violated, regardless of whether the organization is motivated by the desire for profit or by social conscience.

**17.** The parties have strenuously contested the reach of *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), with regard to the issue of standing to represent persons who are not directly discriminated against but are denied the opportunity to reside in integrated neighborhoods. That case, however, as well as the subsequent cases of *TOPIC v. Circle Realty*, 532 F.2d 1273 (9th Cir. 1976); *Village of Bellwood v. Gladstone Realtors*, 569 F.2d 1013 (7th Cir. 1978); *Wheatley Heights Neighborhood Coalition v. Jenna Resales Co.*, 429 F.Supp. 486 (E.D.N.Y.1977), and *Fair Housing Council of Bergen County,*

*Inc. v. Eastern Bergen County Multiple Listing Service, Inc.*, 422 F.Supp. 1071 (D.N.J.1976), deal with plaintiffs who were white residents of an apartment or community that was allegedly segregated because of the practices of real estate agents. These white plaintiffs claimed injury in fact by virtue of their being prevented from enjoying the benefits of interracial contacts.

By contrast, it appears that the organizational plaintiffs in the instant case seek to enforce the rights of their minority members who are not now residents of the apartments owned by defendants. It is claimed that the policies of the defendants contribute to segregation in the Lower East Side. However, if the individual minority members of the organizational plaintiffs wish to move into these apartments, they already have standing to claim *direct* discrimination. On the other hand, if they have no desire to move into these apartments, then their inability to develop the interracial contacts they desire is a product of their own choice, and it is hard to see how they can claim injury in fact.

Thus the problems presented by the posture of the plaintiffs in this case make it inappropriate to address the arguments of the parties regarding standing to raise claims of indirect discrimination under 42 U.S.C. § 3612.