UNITED STATES GENERAL, INC., a Wisconsin Corporation, Plaintiff,

v.

CITY OF JOLIET et al., Defendants.

No. 75 C 4002.

United States District Court, N. D. Illinois, E. D.

April 5, 1977.

Jerome E. Wexler, John P. C. Duncan, Holleb, Gerstein & Glass, Chicago, Ill., for plaintiff.

Samuel J. Horwitz, Frank J. Scarpelli, Chicago, Ill., for defendants.

Raymon A. Feeley, Joliet, Ill., designated counsel for D'Amico.

James M. P. D'Amico, pro se.

## MEMORANDUM DECISION

MARSHALL, District Judge.

Plaintiff, a Wisconsin corporation engaged in the development and construction of housing for low income families, brought this civil rights action seeking damages against the City of Joliet and various city officials who refused to issue building permits for two housing projects in Joliet. De-

fendants have filed motions to dismiss, challenging many aspects of the complaint. Their objections can be classified into four categories. First, defendants claim that plaintiff lacks standing. Second, they assert immunity under theories of sovereign, official, and tort immunity. Third, they contend that some counts are barred by the statute of limitations. Finally, they raise a group of objections relating to the capacity of the plaintiff and to the scope of their own police power.

For present purposes, we accept the following pleaded facts as true. The City of Joliet is a racially segregated community. In 1970, it had a minority population of black and Mexican Americans numbering 18,111, approximately 12% of the total population. By 1973, the Housing Authority of Joliet (HAJ) constructed and operated about 450 units of public housing for low-income families and about 850 units of public housing for the elderly. Virtually all occupants of the family units were black or Mexican, but only 10% of the units for the elderly were rented by members of either of these two minority groups. It is claimed that the sites of these public housing buildings were selected to perpetuate the pattern of racially segregated housing in Joliet.

By 1970, HAJ and the City Council of Joliet determined that a need existed in the community for additional public housing. The City passed Resolution # 1695 approving HAJ's application to the United States Department of Housing and Urban Development (HUD) for a preliminary loan of $140,000 for planning and surveys leading to construction of 700 additional units of public housing. After a period of negotiations between HUD and HAJ, two projects crystallized. The first, Project Illinois 24–7, consisted of 75 new single-family houses to be located at sites scattered throughout Joliet. These houses were intended for sale to low-income families. Project Illinois 24–8 consisted of rental units for low-income families and elderly people. Twenty-five units of family housing in townhouses were to be located on three separate sites, and 120 units of high-rise apartments for the elderly were to be located on a single site.

In 1972, HAJ, with the approval of HUD, selected plaintiff as the developer of both projects. Plaintiff then bought or purchased options on each of the sites approved by HUD for the housing projects. Plaintiff also prepared development programs for both housing projects. In September, 1973, plaintiff entered into a contract with HAJ. Plaintiff agreed to construct all the proposed rental units, located on a total of four sites, and to sell them to HAJ. Plaintiff began performance under this contract immediately. The scattered-site single-family dwellings project never reached the contract stage.

Next, plaintiff needed to secure a zoning change for one of the low-rent family townhouses. Plaintiff submitted a rezoning proposal to the Plan Commission of Joliet and the Plan Commission recommended that the Joliet City Council adopt an ordinance making the change. Defendant council members, however, refused to do so. Instead, at a meeting held on December 3, 1973, the Council passed the following motion:

> that the City Council instruct the Building Department of Joliet to withhold all building permits for Federal housing projects until the entire plan of the Housing Authority can be reviewed and that letters be sent to U. S. General and the Housing Authority notifying them of what is being done.

According to the proceedings of that meeting, the Assistant Corporation Counsel and the City Manager told the council members that a class moratorium on public housing would be "an act of discrimination" and "definitely unconstitutional." Defendant's Memorandum, Exhibit A. After this meeting, plaintiff applied for building permits, but its application was denied.

In August, 1974, the city repealed its 1970 resolution supporting additional public housing in Joliet, because the city wanted more input regarding site selection. It was concerned about the impact of public housing on the surrounding community. Defendant D'Amico, the city attorney, wrote

plaintiff a letter explaining that the city council wanted the high-rise project for the elderly to proceed, but was withholding the permit because it wanted the opportunity to review the sites of all proposed projects. In other words, the city council members were concerned about the location of the scattered-site housing projects, which were likely to be filled with minority group occupants.

Plaintiff filed a seven-count complaint seeking compensation for its expenditures, lost profits, and punitive damages. Counts I through IV allege that defendants are guilty of intentional and malicious discrimination in violation of various civil rights statutes and constitutional safeguards. Count I rests on the Fifth Amendment, the Fourteenth Amendment, and 42 U.S.C. §§ 1981 and 1982. Count II alleges violations of 42 U.S.C. § 2000d, which prohibits discriminatory exclusion from programs receiving federal funds. Count III is based on the Fair Housing Act of 1968, 42 U.S.C. §§ 3604 and 3617. Count IV alleges that defendants conspired to deprive plaintiff of the equal protection of the laws in violation of 42 U.S.C. § 1985(3). The last three counts of the complaint are based on diversity of citizenship between the parties and claim damages in excess of $10,000. Count V alleges that defendants committed tortious interference with plaintiff's contract rights. Count VI claims damages sustained when plaintiff detrimentally relied on the promises of defendant City of Joliet. Plaintiff contends that the ordinances of Joliet provide that building permits shall be issued to applicants if the applications are in proper form, if they conform to building regulations, and if the fee is paid. This ordinance, plaintiff contends, constitutes a promise.[1] Count VII requests damages for deprivation of rights secured by Article I, § 17 of the Illinois Constitution, which prohibits racial discrimination in the sale of property. Section 17 provides that the rights it creates are enforceable without action by the General Assembly.

## I. Standing

■ Defendants first claim that the case must be dismissed because plaintiff lacks standing to bring it. The Supreme Court addressed standing in *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), and sketched out a method for analyzing standing issues which we must follow. The Court's two part test consists of the threshold constitutional requirement of justiciability and of additional "prudential" limitations on the exercise of judicial power. To satisfy the constitutional requirement, the plaintiff must allege a personal stake in the outcome of the litigation. He must assert that he has suffered actual or imminent injury from the allegedly illegal action. To satisfy the prudential test, the plaintiff must assert his own legal rights and not the rights of third persons. Since the prudential limitations are matters of judicial self-governance rather than constitutional limitations, there are a number of exceptions to the rule barring third-party standing. Two of these exceptions must be mentioned. First, a plaintiff may assert constitutional rights of another, when defendant's action adversely affects an existing relationship between plaintiff and the third party, or when the third party is somehow inhibited from asserting its own rights. Second, a plaintiff may assert rights of another if Congress expressly or impliedly granted standing to persons in the plaintiff's position.

■ Under the two-part analysis, plaintiff has satisfied the minimal constitutional requirement of injury in fact. Plaintiff has suffered actual, concrete injury as a result of defendants' decision to withhold building permits. When defendants refused to issue permits, plaintiff was already the named developer for the two housing projects and was already under contract to build the buildings for one of them. Plaintiff had expended time and money in planning, and had acquired outright or bought options on specific parcels of property for both the

1. We have doubts about whether an ordinance can be a promise but make no ruling on the sufficiency of Count VI since defendants have failed to raise the point.

rental units and the scattered site units. Finally, plaintiff completed applications for building permits and was turned down. It is hard to imagine a better example of injury in fact in this type of action. *Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 262, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977); *cf. Planning for People Coalition v. County of DuPage, Illinois,* 70 F.R.D. 38, 44 n. 5 (N.D. Ill.1976).

In Counts V and VI, plaintiff is asserting its own legal rights and not the rights of another. Count V alleges that defendants' conduct was a tortious interference with plaintiff's own contract rights. Count VI alleges that plaintiff itself detrimentally relied on the ordinances of Joliet. *See Citizens Committee for Faraday Wood v. Lindsay,* 507 F.2d 1065, 1079 (2d Cir. 1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1679, 44 L.Ed.2d 102 (1975) (Oakes, J., dissenting). Consequently, both tests of *Warth* are satisfied and plaintiff has standing to bring Counts V and VI.

Plaintiff's standing to bring Counts I through IV and VII is more problematic because in these civil rights counts, plaintiff relies on the legal rights of third parties, the minority group families who would have ultimately resided in the proposed public housing units. Neither the prospective tenants nor any organizations representing them are presently before the court; United States General is the sole plaintiff. Cf. *Arlington Heights v. Metropolitan Housing Development Corporation, supra,* 97 S.Ct. at 562. "As a corporation, [it] has no racial identity and cannot be the direct target of [defendants'] alleged discrimination." *Id.* Thus, our task is to determine whether plaintiff may rely on any exception to the prudential rule which normally bars plaintiff from asserting the legal rights of third parties.

■ The first exception exists if the defendants' conduct precludes or adversely affects a relationship between plaintiff and the third party. While we recognize that this exception may be relevant in certain cases involving public housing, it is not applicable in the present circumstances. First, the relationship between plaintiff and the third parties is extremely attenuated if it exists at all. Specifically, had plaintiff been permitted to construct the housing, it would have sold the buildings to HAJ. HAJ, in turn, would have sold or leased them to the third parties, the minority group families whose civil rights were violated.[2] Second, the damages requested would not benefit the third parties in any way and the opportunity to alleviate their injury is one reason for granting standing. For example, a physician might have standing to attack the constitutionality of an antiabortion statute and to raise the constitutional rights to privacy of their women patients who seek abortions. If the physician asked the court to strike the statute, and the court granted this relief, then women patients would be able to obtain abortions. *See Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). Here, on the other hand, plaintiff does not seek a mandatory injunction requiring the City of Joliet to issue the building permits. Apparently, it no longer wishes to construct the public housing. Thus, if plaintiff prevailed on the merits, it would obtain damages for itself and the minority group families would receive no benefit. For these reasons, plaintiff lacks standing to bring this action solely as a result of the indirect relationship between it and the minority group families.

Thus, we must turn to the second exception to the rule against standing to represent third parties. This exception is that Congress may expressly or by implication

---

2. *Compare* R. Sedler, *Standing to Assert Constitutional Jus Tertii in the Supreme Court,* 71 Yale L.J. 599, 649 (1962). The author suggests that where action is taken against one party to a professional relationship (e. g., a lawyer), the rights of the other party (e. g., a client) may be destroyed before he can take action to protect those rights. If the lawyer is not granted standing, the client's claim cannot be litigated. It is suggested, however, that this exception be limited to professional relationships, because such relationships imply fiduciary obligations missing in purely commercial relationships.

grant standing to litigants to raise rights of third parties. In deciding whether plaintiff has standing under any of the civil rights statutes alleged in the complaint, several observations are necessary. First, although there are a number of decisions dealing with standing, and a number of decisions dealing with the development of public housing, neither the Supreme Court nor the Seventh Circuit has ever faced the precise issue of whether public housing developers have standing to assert the constitutional rights of future residents of proposed housing projects in an action for damages. In *Arlington Heights, supra*, the Court did not decide

> "whether the circumstances of this case would justify departure from [the] prudential limitation and permit [petitioner] to assert the constitutional rights of its prospective minority tenants . . . [because there was in this case] at least one individual plaintiff who has demonstrated standing to assert these rights on his own."

97 S.Ct. at 562.

Thus, we must extrapolate from the existing cases, trying to gauge the precise rulings with our sense of how the Court would rule on this issue. Second, it is imperative to analyze standing apart from the factual merits of the case. The standing issue determines only whether plaintiff is the right party to bring the action, not whether the plaintiff will prevail.

■ Plaintiff's strongest argument for statutorily based standing rests on the Fair Housing Act of 1968, 42 U.S.C. §§ 3601–31. 42 U.S.C. § 3604 prohibits discrimination because of race against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith. 42 U.S.C. § 3617 grants a right of action to persons who have been interfered with as they aided others in their exercise of rights protected by § 3604. Without more, the language of § 3617 indicates that Congress intended to grant standing to persons who help others to exercise protected rights, even if those persons did not suffer injury to their own legal rights. The Congressional purpose underlying the Fair Housing Act is expressed in § 3601, Declaration of Policy:

> It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States.

There are three important decisions discussing standing under the Fair Housing Act.

In *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), the question was whether a white tenant and a black tenant in a large housing complex had standing to challenge the owner's discriminatory acts directed against nonwhite rental applicants. The Court held that the plaintiff tenants did have standing. In part, the opinion suggests that plaintiffs' status as tenants was the controlling factor. Since defendants allegedly deprived plaintiffs of the benefits of living in an integrated community, the Court noted that the acts complained of affected the very quality of the plaintiffs' daily lives. In other words, the defendant's acts injured the tenants' own right to live in an integrated community. The Court went beyond a discussion of the plaintiffs' status in its explanation of why plaintiffs had standing. It noted that the Congressional intention in the Fair Housing Act was to extend standing to all persons within the limits established by the Constitution, and that the primary method of enforcement consisted of complaints by private persons. Further, the Court mentioned that private complainants act in the role of private attorneys general, since the Attorney General's resources are far too small to effectively enforce the Congressional policy. The upshot of this explanation is that the Fair Housing Act of 1968 may be a statute creating an exception to the prudential standing rule. Yet the holding in *Trafficante* was carefully limited to tenants; the standing of developers or other plaintiffs under the Fair Housing Act was not mentioned.

The decision in *Park View Heights v. City of Blackjack*, 467 F.2d 1208 (8th Cir. 1972), was issued just a few months before *Trafficante*. There, individual black plaintiffs were joined by two not-for-profit corporations directly involved in sponsoring and developing a specific public housing project. The plaintiffs asked the court to invalidate a local zoning ordinance which effectively prohibited the construction of this moderate income housing. Plaintiffs brought the action under various constitutional provisions and 42 U.S.C. §§ 1981, 1982, 2000d, 3601, and 1401.

The court held that the sponsor and the developer had standing to litigate the constitutional violations. The court said that corporations could assert their own right because they had suffered real economic injury:

> It is as important to protect the right of sponsors and developers to be free from unconstitutional interferences in planning, developing, and building an integrated housing project as it is to protect the rights of potential tenants of such projects. 467 F.2d at 1212.

Next, the court said that the corporate plaintiffs had standing to assert the constitutional rights of the individual plaintiffs because the interests of the two groups of plaintiffs were intimately close. Both wanted to be free from the impact of discriminatory zoning. The corporate plaintiffs were ready to begin construction. The individual plaintiffs were persons who had the qualifications and the desire to live in the units. The only barrier was the zoning ordinance.

The court in *Park View Heights* then held that the corporate plaintiffs also had standing to assert the rights of the individual plaintiffs under 42 U.S.C. §§ 1981, 1982, and 3604. In reaching this conclusion, the court did not closely analyze the rights of developers under specific statutes to decide whether Congress meant to extend standing. Nor did the court mention or evaluate the relationship between the developer and the individual minority plaintiffs.

The impact of *Park View Heights* is difficult to ascertain. On the one hand, the court in broad language affirmed the standing of developers to assert the rights of potential black tenants in public housing. On the other hand, the holding might be limited to situations in which the developer stands ready to build the housing and the tenant would derive some benefit from judicial relief.

The final decision in this line of cases is *Warth v. Seldin, supra*. In this context, *Warth* is relevant for its dicta discussing standing under the Fair Housing Act of 1968. In *Warth*, plaintiff Metro-Act, a not-for-profit corporation, claimed standing to assert the rights of some of its members under constitutional provisions and under 42 U.S.C. §§ 1981 and 1982—but *not* under the Fair Housing Act of 1968. Some of the members of Metro-Act lived in a city with exclusionary zoning ordinances and were allegedly deprived of the benefits of living in an integrated community. The Court said that *Trafficante* was not controlling because that action was brought under the Fair Housing Act which, the Court indicated, created a statutory right conferring standing. With respect to Metro-Act's standing had it brought its action under the Fair Housing Act of 1968, the Court said,

> We intimate no view as to whether, had the complaint alleged purposeful racial or ethnic discrimination, Metro-Act would have stated a claim under § 3604. See *Park View Heights v. City of Blackjack*, 467 F.2d 1208 (8th Cir. 1972). 422 U.S. at 513 n. 21, 95 S.Ct. at 2213.

In our reading of these decisions, plaintiff United States General has standing to assert the rights of prospective minority tenants in Joliet public housing under the Fair Housing Act. In reaching this result, we do not find that these tenants are precluded from asserting their own rights or that there is a close relationship between the tenants and plaintiff. If plaintiff prevails, it will recover for its own injury and not for the injury to the third parties. Instead, the controlling factors are twofold. First, Congress intended to expand standing under

§ 3617, and created an exception to the prudential rule. Second, developers are essential participants in the growth of integrated public housing, and it is consistent with the broad sweep of the Act to permit them to enforce its prohibitions.

One final aspect of plaintiff's standing under the Fair Housing Act must be explained. In *Warth,* the Court said that under the Fair Housing Act, residents of housing have a right to be free from consequences of discriminatory practices immediately harmful to others. 422 U.S. at 513, 95 S.Ct. 2197. This concern with immediacy suggests not only that the third parties' legal rights be injured, but that that injury be ripe. The complaint shows that the minority group families did sustain injury in fact. Although United States General has not named names of potential tenants, it alleges that there is a demand for additional public housing which was the impetus behind the housing projects. Further, the complaint alleges that there were many families on waiting lists for the existing public housing in Joliet, and that most of these families were black.

■ We reach a different result on all of plaintiff's other statutory civil rights claims and hold that plaintiff lacks standing under 42 U.S.C. §§ 1981, 1982, 1985(3), and 2000d. None of these general civil rights statutes waives the prudential rule barring third-party standing, especially when there is no existing relationship between plaintiff and the third party, and the relief requested would not redress the injury to the third party. *Warth v. Seldin,* 422 U.S. 490, 514 n. 22, 95 S.Ct. 2197, 45 L.Ed.2d 343 (§§ 1981, 1982); *Sullivan v. Little Hunting Park,* 396 U.S. 229, 237, 90 S.Ct. 400, 24 L.Ed.2d 386 (§§ 1981, 1982). *Construction Industry v. City of Petaluma,* 522 F.2d 897, 904 (9th Cir. 1975) (§§ 1981, 1982); *Murphy v. Mount Carmel High School,* 543 F.2d 1189 (7th Cir. 1976) (§ 1985(3)). Reported decisions with language to the contrary such as *Sisters of Providence v. City of Evanston,* 335 F.Supp. 396, 400 (N.D.Ill.1971), must be regarded as limited by *Warth.*

In sum, plaintiff has standing to bring Counts III, V, VI and VII of the complaint. Counts I, II, and IV must be dismissed.

## II. *Immunity*

■ Defendant raises several theories of immunity. First, defendant City of Joliet seeks immunity under all civil rights counts deriving from municipal immunity under 42 U.S.C. § 1983. *City of Kenosha v. Bruno,* 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). Numerous actions have been brought against cities under the Fair Housing Act of 1968, and cities enjoy no immunity under that statute. *E. g., Park View Heights, supra*; *Kennedy Park Homes v. City of Lackawanna,* 436 F.2d 108 (2d Cir. 1970).

■ Next, defendant D'Amico, the City Attorney of Joliet, claims that he is absolutely immune from liability. His argument is that attorneys acting in their professional roles are generally immune from liability under civil rights statutes, even if their clients are not. The policy is that the attorney is not personally involved in the action of the client, and every client is entitled to legal representation. As the court said in *United States General, Inc. v. Schroeder,* 400 F.Supp. 713, 717 (E.D.Wis. 1975), the civil rights statutes should not be invoked to create a conflict between the attorney's duties to protect himself and to zealously represent his client. Nevertheless, D'Amico was a city employee himself and as a city employee his interests may have been allied with the other city officials and employees. When and after the decision to withhold the permits was made, his role in the matter of public housing was as an advisor, not as a litigator. *See Donovan v. Reinhold,* 433 F.2d 738, 743 (9th Cir. 1970). Moreover, plaintiff alleged that D'Amico acted with malice. D'Amico is protected by good faith immunity, not absolute immunity. After plaintiff has had an opportunity to engage in discovery, D'Amico may renew his claim of good faith, if appropriate, in a motion for summary judg-

ment.[3] Defendant Albert also is protected by good faith immunity. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

■ With respect to the counts based on diversity of citizenship, Counts V, VI, and VII, defendants claim immunity under the Illinois Local Government Tort Immunity Act. Alternatively, they claim that the City of Joliet must be dismissed because plaintiff failed to give notice to the City as required in the Tort Immunity Act, *Ill.Rev. Stat.* ch. 85, § 8–102. The tort immunity act does not affect contract actions, *Ill.Rev. Stat.* ch. 85, § 2–101, and the notice requirement in § 8–102 does not apply to actions brought under other Illinois statutes. *Hecko v. City of Chicago*, 25 Ill.App.3d 572, 323 N.E.2d 595 (1st Dist. 1975). Thus, defendants' argument concerns only the tort theory raised in Count V. Since plaintiff did not file the statutory notice against the city, defendants City of Joliet and its employees and officials are dismissed from Count V. As they constitute all of the defendants to that count, it must be dismissed.

### III. *Statute of Limitations*

■ Defendants contend that Count III, brought under the Fair Housing Act of 1968, is barred by the 180-day statute of limitations in 42 U.S.C. § 3612. In *Smith v. Stechel*, 510 F.2d 1162 (9th Cir. 1975), the court held that the 180-day statute of limitations is not applicable to civil actions brought under § 3617. We find the reasoning of *Smith* persuasive. Accordingly, defendants' motion to dismiss Count III on this basis is denied.

### IV. *Remaining Objections to the Complaint*

■ Defendants question the capacity of United States General to bring this action because plaintiff is not an Illinois corporation and because a corporation is not a citizen under the privileges and immunities clause of the Fourteenth Amendment. The first argument is wrong. Plaintiff, a foreign corporation registered to do business in Illinois, may bring this action. *Ill. Rev.Stat.* ch. 32, § 157.103. The second assertion is irrelevant to the remaining counts in the complaint, Counts III, V, VI and VII.

■ Finally, defendants contend that the actions of the Joliet City Council were within its police power. Consideration of this ground is premature. The justification for defendants' actions raises factual issues which should be resolved at trial or at least after discovery.

Count VII, based on Article I, § 17 of the Illinois Constitution, raises difficult questions under Illinois law. We have found no reported decisions construing this constitutional provision. It is unnecessary to make independent rulings on the sufficiency of Count VII at this time.

In sum, Counts I (Fifth and Fourteenth Amendments and §§ 1981 and 1982), II (§ 2000d), and IV (§ 1985(3)) are dismissed because plaintiff lacks standing, and Count V is dismissed for failure to give notice under § 8–102. In all other respects, defendants' motions to dismiss are denied and they are ordered to answer in 20 days.

---

**3.** In its Memorandum in Support of defendants' Motion for a ruling and for leave to file affidavits, various defendants have submitted conclusory affidavits stating that they were not racially motivated. These affidavits are insufficient to support a grant of summary judgment on the issue of intent. *Askew v. Bloemker*, 548 F.2d 673 (7th Cir. 1976).