29 F.3d 1439
 65 Fair Empl.Prac.Cas. (BNA) 750,
1994-1 Trade Cases P 70,648
Denard M. FOBBS, M.D., Plaintiff-Appellant,
v.
HOLY CROSS HEALTH SYSTEM CORPORATION, a California
corporation, doing business as Saint Agnes Hospital and
Medical Center; Cynthia Bergmann, M.D.; James Cahill,
M.D.; Jay Christensen, M.D.; Charles Gavin, M.D.; Seung
Nam Kim; Robert Meltvedt, M.D.; Marshall Noel, M.D.;
Morton Rosenstein, M.D.; Roydon Steinke, M.D.; Robert
Wilson, M.D.; Larry E. Nix, Defendants-Appellees.
 No. 92-15852.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 12, 1994.
Decided July 19, 1994.
 
 James F. Tritt, Tritt and Tritt, and Jacob M. Weisberg, Fresno, CA, for plaintiff-appellant.
 David H. Bent, McCormick, Barstow, Sheppard, Wayte & Carruth, Fresno, CA, for defendants-appellees, Holy Cross Health System Corp., and Saint Agnes Medical Center.
 J. Robert Liset, Musick, Peeler & Garrett, Los Angeles, CA, for Physician defendants.
 Appeal from the United States District Court for the Eastern District of California.
 Before: FLETCHER, FERGUSON, and TROTT, Circuit Judges.
 FERGUSON, Circuit Judge:
 
 
 1
 Plaintiff Denard M. Fobbs, M.D. seeks judgment against defendant St. Agnes Hospital and Medical Center ("St. Agnes" or "hospital") and various individual physician defendants who were on the Medical Staff and served on various peer review committees at the hospital for the summary suspension of his staff privileges.
 
 
 2
 In 1987, Dr. Fobbs, an African American, was granted privileges by the hospital to perform intra-abdominal laser surgery as a member of the Department of Obstetrics-Gynecology/Perinatology. After the hospital summarily suspended these privileges on September 29, 1989, Dr. Fobbs filed a complaint against defendant Holy Cross Health Systems Corporation, its subsidiary Saint Agnes Hospital, and twenty-seven individual defendant physicians.
 
 
 3
 After a series of motions and amendments, Dr. Fobbs' second amended complaint consisted of various allegations involving civil rights and antitrust violations.
 
 
 4
 This appeal involves the following specific claims in that complaint: the first claim pursuant to the Sherman Antitrust Act, 15 U.S.C. Sec. 2; the second claim pursuant to 42 U.S.C. Sec. 1981; the third claim pursuant to Title VI of the Civil Rights Act, 42 U.S.C. Sec. 2000d, against Saint Agnes Hospital only; and the fourth claim pursuant to 42 U.S.C. Sec. 1985(3).
 
 
 5
 On August 20, 1990, the district court granted the physician defendants' motion to dismiss the Sec. 1985 claim and granted the hospital's motion to dismiss the Title VI claim.
 
 
 6
 On November 25, 1990, the court granted physician defendants' motion for partial summary judgment as to the Sec. 1981 claim on the basis that it was time-barred.
 
 
 7
 On March 17, 1992, the court granted summary judgment in favor of all defendants on the Sherman Antitrust Act claim, holding that they were immune from federal antitrust liability by virtue of the provisions of the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. Sec. 11101, et seq.
 
 I. DISCUSSION
 A. Sherman Antitrust Act Claim
 
 8
 The district court has published its order granting defendants' motion for summary judgment on the Sherman Antitrust Act claim. Fobbs v. Holy Cross Health System Corp., et al., 789 F.Supp. 1054 (E.D.Cal.1992).
 
 
 9
 We affirm the district court's order with the following addition to its opinion, which affects section V.A.3. set forth on pages 1067 and 1068 relating to whether the summary monitoring restraints prior to any notice or hearing violated the HCQIA.
 
 
 10
 A review committee may immediately suspend or restrict clinical privileges "subject to subsequent notice and hearing or other adequate procedures, where the failure to take such an action may result in an imminent danger to the health of any individual." 42 U.S.C. Sec. 11112(c)(2). We agree that the summary restrictions of Dr. Fobbs' clinical privileges by means of the monitoring requirements meet the requirements of Sec. 11112(c)(2).
 
 
 11
 Dr. Fobbs was the only physician in the Central Valley of California at the time performing laser surgery in obstetrics cases. After he performed a few such surgeries, questions were raised by the defendants as to possible irregularities with respect to three cases. The Supervisory Committee at the hospital invited Dr. Fobbs to discuss these cases. As a result of this meeting, copies of the case charts were sent for analysis and review to Dr. Donald R. Ostergard, Professor of Obstetrics and Gynecology at the University of California, Irvine, who was a former teacher of Dr. Fobbs.
 
 
 12
 Dr. Ostergard submitted a response in which he concluded that there were difficulties relating to responsibilities of both Dr. Fobbs and hospital employees. In the first case, there was improper functioning of the laser equipment. In that case, Dr. Ostergard criticized the hospital nursing staff for failing to calibrate the laser equipment before the surgery and failing to notify Dr. Fobbs of the equipment malfunction. He also concluded, however, that Dr. Fobbs used poor judgment in leaving the laser patient under anesthesia to deliver another obstetrical patient. In the second case, he concluded that Dr. Fobbs performed an unnecessary dilatation and curettage. Regarding the third patient, Dr. Ostergard reported that there was a lack of judgment on Dr. Fobbs' part in performing vaporization of endometriosis. Finally, he reported that these patients did not have a written or dictated history and physical examination on their charts at the time of the laser procedures.
 
 
 13
 Shortly after Dr. Ostergard's report was received, Dr. Fobbs wrote to the hospital, setting forth a conversation he had with Dr. Ostergard and claiming that he had done no wrong. The Supervisory Committee recommended to the Medical Executive Committee ("MEC") that monitoring be imposed. The following monitoring restrictions were then summarily imposed:
 
 
 14
 (1) Plaintiff was to have a second opinion on every admission to St. Agnes Medical Center;
 
 
 15
 (2) This was to include a history and physical examination by the monitor;
 
 
 16
 (3) On any surgical procedures, the monitor was to be present during the operation;
 
 
 17
 (4) The follow-up care of the patient was to be shared with the monitor; and
 
 
 18
 (5) The monitors were to be members of the Ob-Gyn/Perinatology Supervisory Committee.
 
 
 19
 Dr. Fobbs contends that the statute requires that there be "imminent danger to the health of any individual" before there may be a summary restriction. However, the statute does not require imminent danger to exist before a summary restraint is imposed. It only requires that the danger may result if the restraint is not imposed.
 
 
 20
 The record of the problems caused by Dr. Fobbs clearly supports the conclusion of the MEC that a summary restriction be taken to avoid imminent danger. Dr. Fobbs was not suspended, his practice was not limited, and his access to the hospital was not limited. The monitoring conditions were necessary in light of the past history of Dr. Fobbs and his laser surgery. The defendants had ample medical justification to take the steps. The district court correctly granted defendants HCQIA immunity with respect to the summary monitoring restrictions.
 
 
 21
 We address in more detail the three other claims of Dr. Fobbs' complaint as they are not included in the published opinion of the district court.
 
 B. 42 U.S.C. Sec. 1981 Claim
 
 22
 Dr. Fobbs alleges that defendants deprived him of his rights under 42 U.S.C. Sec. 1981, which confers upon "[a]ll persons ... the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens," in suspending his staff privilege without just cause or due process.
 
 
 23
 The MEC decided to summarily suspend Dr. Fobbs on August 26, 1987. Dr. Fobbs received notification on August 29, 1987. He did not file suit until September 29, 1988, over a year after receiving notification. Dr. Fobbs concedes that his Sec. 1981 claim is subject to California Code of Civil Procedure Sec. 340(3), California's one-year statute of limitations applicable to personal injury actions. He presents four theories, however, which he contends preserve his claim. We conclude that these theories are inadequate to save his claim.
 
 1. Date When Claim Accrued
 
 24
 Dr. Fobbs contends that he is not precluded from bringing suit on this claim because the statute did not begin to run until September 30, 1988, the date on which he contends defendants' improper action became final. In the alternative, he argues the statutory period began October 10, 1988, the date of defendants' letter allegedly formalizing his suspension and denying his request for fair hearing conditions, which he contends was the last manifestation of defendants' allegedly continuing violation of Sec. 1981.
 
 
 25
 "[A]lthough states' statutes of limitation apply [to Sec. 1981 claims], federal law governs when the claim accrues and the limitation period begins to run." Chung v. Pomona Valley Community Hosp., 667 F.2d 788, 791 (9th Cir.1982) (citing Cope v. Anderson, 331 U.S. 461, 464, 67 S.Ct. 1340, 1341-42, 91 L.Ed. 1602 (1947)).
 
 
 26
 This case is governed by Delaware State College v. Ricks, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), in which the Supreme Court rejected a claim similar to Dr. Fobbs'. In Ricks, plaintiff filed suit under Title VII and 42 U.S.C. Sec. 1981 against his employer, Delaware State College, after it denied him tenure. He then filed a grievance pursuant to internal administrative policy with the college Board of Trustees. Six months later, the Board notified Ricks that it denied his grievance.
 
 
 27
 Ricks contended that because he was granted a one-year "terminal" contract after being denied tenure, the applicable statute of limitation did not begin to run until the expiration of the contract. The Court rejected this argument, concluding that Ricks' claim accrued the date the tenure decision was made and defendants notified Ricks. Id. at 259-60, 101 S.Ct. at 504-05.
 
 
 28
 The Court also considered amicus curiae EEOC's argument that the statute of limitation did not begin to run until the Board of Trustees denied Ricks' grievance. The EEOC argued that the Trustees' initial decision to deny Ricks tenure was "only an expression of intent that did not become final until the grievance was denied." Id. at 260, 101 S.Ct. at 505. The Court rejected this argument, stating that "entertaining a grievance complaining of the tenure decision does not suggest that the earlier decision was in any respect tentative. The grievance procedure, by its nature, is a remedy for a prior decision, not an opportunity to influence that decision before it is made." Id. at 261, 101 S.Ct. at 506 (emphasis in original).
 
 
 29
 Thus, Dr. Fobbs' contention that his claim did not accrue when the St. Agnes MEC notified him that his hospital privileges were being summarily suspended must fail.
 
 2. California's Equitable Tolling Doctrines
 
 30
 Dr. Fobbs invokes California's equitable tolling doctrines to make two related contentions. First, he contends that this court should apply California's equitable tolling rule to the period during which he pursued his claim through the Office for Civil Rights ("OCR"), September 1988 to September 1989, because "he pursued in good faith a legal remedy designed to lessen the extent of his injury or damages." Second, Dr. Fobbs contends that the limitations period for his civil action was tolled during the time consumed by the internal hospital administrative proceedings "because during that period [he was] legally prevented from taking any action to protect his rights."
 
 
 31
 California's doctrine of equitable tolling allows a plaintiff to toll the state statute of limitations "when a person has 'several formal legal remedies and reasonably and in good faith pursues one.' " Donoghue v. Orange County, 848 F.2d 926, 930 (9th Cir.1987) (quoting Jones v. Tracy School Dist., 27 Cal.3d 99, 108, 165 Cal.Rptr. 100, 104, 611 P.2d 441, 445 (1980)). "The equitable tolling 'rule is not predicated upon the necessity of the completion of the one remedy as a prerequisite to the pursuit of the other.' " Id. (quoting Myers v. Orange County, 6 Cal.App.3d 626, 635, 86 Cal.Rptr. 198, 203 (1970)). "The doctrine suspends the statute of limitations pending exhaustion of administrative remedies, even though no statute makes exhaustion a condition of the right to sue." Id. at 931.
 
 
 32
 There are three threshold matters plaintiff must overcome before he may benefit from California's equitable tolling doctrine. First, the tolling doctrines must not be "inconsistent with federal policy underlying the cause of action under consideration." Id. at 930 (citing Chardon v. Fumero Soto, 462 U.S. 650, 657, 103 S.Ct. 2611, 2616, 77 L.Ed.2d 74 (1983)). See also Conerly v. Westinghouse Elec. Corp., 623 F.2d 117, 119 (9th Cir.1980) (Sec. 1981 action).
 
 
 33
 Second, where "plaintiff has pursued a remedy as to only one of several distinct wrongs," the equitable tolling doctrine does not apply to those other wrongs. Donoghue, 848 F.2d at 931 (citing Arnold v. United States, 816 F.2d 1306, 1312 (9th Cir.1987)).
 
 
 34
 Finally, California law requires that a plaintiff fulfill three "core elements," that: (1) he gave timely notice to the defendant in filing the first claim; (2) defendant is not prejudiced in gathering evidence to defend against the second claim; and (3) plaintiff acted in good faith and with reasonable conduct in filing the second claim. Id. (citing Collier v. City of Pasadena, 142 Cal.App.3d 917, 924, 191 Cal.Rptr. 681, 684-85 (1983)).
 
 
 35
 a. Tolling Effect of the Pending Office for Civil Rights
 
 Inquiry
 
 36
 As discussed below, Dr. Fobbs fails to meet the threshold requirements to benefit from the equitable tolling doctrine. Thus, the running of the statute of limitations should not be tolled from September 1988 to September 1989, the period during which the OCR investigated Dr. Fobbs' claim.
 
 1. Inconsistency with Federal Policy
 
 37
 Dr. Fobbs has made no showing that applying the equitable tolling doctrine to his Sec. 1981 claim would not be inconsistent with federal policy.
 
 2. Remedies for Distinct Wrongs
 
 38
 Dr. Fobbs argues that his Title VI grievance through the OCR addresses the same wrongs as his Sec. 1981 claim in federal court because in both cases, he seeks to show that defendants have discriminated against him on the basis of his race by imposing monitoring and supervision requirements on him. See Johnson v. Greater Southeast Community Hosp. Corp., 951 F.2d 1268, 1275 (D.C.Cir.1991).
 
 
 39
 This issue is governed by Johnson v. Railway Express Agency, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). In Railway Express Agency, plaintiff filed charges with the EEOC, which over three years later notified him that he had a right to institute a Title VII civil action against his employer. In addition to his timely filed Title VII action, plaintiff also alleged violation of 42 U.S.C. Sec. 1981. The Court held that plaintiff's Sec. 1981 action was time-barred, even though plaintiff delayed bringing the Sec. 1981 suit because he was waiting in good faith for the EEOC's recommendation.
 
 
 40
 The Court concluded that "the remedies available under Title VII and under Sec. 1981, although related, and although directed to most of the same ends, are separate, distinct, and independent." The court added that it would not, "in the face of congressional emphasis upon the existence and independence of the two remedies, ... infer any positive preference for one over the other, without a more definite expression in the legislation Congress has enacted, as, for example, a proscription of a Sec. 1981 action while an EEOC claim is pending." Id. at 461, 95 S.Ct. at 1721.
 
 
 41
 The same reasoning applies to this case. Dr. Fobbs pursued his claim with the OCR. Congress has not proscribed civil rights plaintiffs from filing Sec. 1981 actions while an OCR investigation is pending. Furthermore, Dr. Fobbs has made only a conclusory showing, insufficient under Railway Express Agency, that the OCR procedures and his Sec. 1981 claim were designed to address the same wrongs and grant the same remedies. See Chambers v. Omaha Public School Dist., 536 F.2d 222, 230-31 (8th Cir.1976) ("The remedies available under Title VI of the Civil Rights Act of 1964 on the one hand, and Sec. 1981 and Sec. 1983 on the other, are completely separate and independent.").
 
 
 42
 3. California's Three "Core Elements"
 
 
 43
 Dr. Fobbs has arguably met the three core elements required under California law. Nonetheless, because he fails to meet the first two threshold requirements, he is not entitled to toll the statute of limitation based on the pendency of his complaint before the OCR.
 
 
 44
 b. Tolling Effect of the Internal Review Process
 
 
 45
 Dr. Fobbs contends that he was required to complete his internal administrative remedies before he could initiate the instant civil suit. The Supreme Court has expressly rejected this argument. In Delaware State College v. Ricks, the EEOC argued as a fallback position that "even if the Board's first decision expressed its official position, ... the pendency of the grievance should toll the running of the limitations periods." 449 U.S. at 260-61, 101 S.Ct. at 505. The Court summarily rejected this argument, stating, "we already have held that the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods." Id. at 261, 101 S.Ct. at 506 (citing Electrical Workers v. Robbins & Myers, Inc., 429 U.S. 229, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976)). Similarly, Dr. Fobbs argues that the running of the statute of limitation should be tolled during the period beginning August 29, 1987, the date he was notified of the suspension, and October 10, 1987, the date the MEC informed him that it would not conduct a hearing pursuant to his conditions. This contention fails under Ricks.
 
 3. Presence of a Continuing Violation
 
 46
 Dr. Fobbs contends that he has alleged a continuing course of intimidation, harassment and disparate treatment culminating in defendants' October 10, 1988 finalization of his suspension and denial of his request for a fair hearing.
 
 
 47
 As defendants point out, however, beyond his conclusory allegation that the hearing procedure would have been "unfair," Dr. Fobbs has not alleged that "after August 26, 1988, he was treated differently than other Medical Staff members." Furthermore, Dr. Fobbs has not distinguished his case from London v. Coopers & Lybrand, where this court stated that "the natural effects of the allegedly discriminatory act are not regarded as 'continuing.' " 644 F.2d 811, 816 (9th Cir.1981). Finally, Dr. Fobbs fails to show how defendants discriminated against him by adhering to St. Agnes bylaws in conducting their hearings and review process.
 
 
 48
 Thus, assuming there was a continuing violation, it ended on August 26, 1988, the date of Dr. Fobbs' summary suspension.
 
 4. Applicability of Estoppel Doctrine
 
 49
 Finally, Dr. Fobbs contends that defendants should be estopped from invoking the statute of limitations as a defense, because Dr. Fobbs reasonably relied on defendants' communications, which led him to believe that the statute of limitations could not have begun to run until September 30, 1988. We disagree.
 
 
 50
 The district court found that the letter of MEC Chairman Dr. V. Roy Smith was neither fraudulent nor misleading and could not be construed as inducing Dr. Fobbs to refrain from bringing his action. The letter made no assertion regarding the statute of limitations nor when his possible legal actions would accrue. Furthermore, it is abundantly clear from the record that Dr. Fobbs did not believe anything the defendants wrote or said to him, and he certainly was not misled.
 
 C. Title VI Claim
 
 51
 Title VI of the 1964 Civil Rights Act, 42 U.S.C. Sec. 2000d, provides in pertinent part that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial aid."The district court dismissed Dr. Fobbs' Title VI claim against defendant St. Agnes on the ground that Dr. Fobbs did not sufficiently allege that he suffered racial discrimination, that he has third party standing, or that the suspension of his privileges necessarily causes discrimination against patients. This court reviews a dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) de novo. Oscar v. University Students Co-op. Ass'n, 965 F.2d 783, 785 (9th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992). We reverse.
 
 1. Pleading Requirements
 
 52
 Dr. Fobbs contends that the district court erred in requiring him to plead that he was the intended beneficiary of a federally funded program in order to state a claim under 42 U.S.C. Sec. 2000d.
 
 
 53
 The district court incorrectly relied on Doe on behalf of Doe v. St. Joseph's Hosp., 788 F.2d 411, 420 (7th Cir.1986), for the proposition that 42 U.S.C. Sec. 2000d requires Dr. Fobbs to plead that he is the intended beneficiary of a federally funded program at St. Agnes. St. Joseph's Hospital is distinguishable because plaintiff in that case expressly argued that she did not have to be a direct beneficiary in order to assert a claim under Sec. 2000d. Id. Rather, she contended that the court should construe the Health and Human Services regulations to grant her a private cause of action. Id. Thus, St. Joseph's Hospital is completely inapposite to the case at hand.
 
 
 54
 To state a claim for damages under 42 U.S.C. Sec. 2000d, et seq., a plaintiff must allege that (1) the entity involved is engaging in racial discrimination; and (2) the entity involved is receiving federal financial assistance. Wrenn v. Kansas, 561 F.Supp. 1216, 1221 (D.C.Kan.1983) (citing Jackson v. Conway, 476 F.Supp. 896, 903 (E.D.Mo.1979)). Although the plaintiff must prove intent at trial, it need not be pled in the complaint. Wrenn, 561 F.Supp. at 1221. Compare Jackson, 476 F.Supp. at 903 (no proof of intent is required if plaintiff seeks only injunctive relief).
 
 
 55
 There is no requirement that plaintiff plead that he was an intended beneficiary of the federally funded program in which defendants are alleged to have participated. Wrenn, 561 F.Supp. at 1221. Cf. Simpson v. Reynolds Metals Co., Inc., 629 F.2d 1226, 1234-35 (7th Cir.1980) (In reviewing complaint under Sec. 504 of the Rehabilitation Act of 1973, 29 U.S.C. Sec. 794, which is modeled after and enforced in the same manner as 42 U.S.C. Sec. 2000d, court should not define program, and therefore identify its intended beneficiaries, in a "very narrow fashion."); Byers v. Rockford Mass Transit Dist., 635 F.Supp. 1387, 1390 (N.D.Ill.1986) ("As long as some federal funding is alleged [in Sec. 504 actions] ..., the program specificity issue is more properly the subject of a summary judgment motion.").
 
 
 56
 2. Sufficiency of Dr. Fobbs' Intended Beneficiary Allegation
 
 
 57
 Dr. Fobbs appears to set forth three theories for recovery under Sec. 2000d. Dr. Fobbs' first theory is that St. Agnes receives federal funds, and that it has impermissibly discriminated against him based on his race. As discussed above, this states a Title VI claim under Wrenn.
 
 
 58
 Dr. Fobbs' second theory is that he is an intended beneficiary of funding designed to improve health care for his patients. He argues that because defendants discriminated against his patients on the basis of their race by discouraging people of color from obtaining medical services at St. Agnes, defendants impermissibly decreased Dr. Fobbs' ability to exercise his profession at St. Agnes. Under this theory, Dr. Fobbs is essentially only an incidental beneficiary of programs designed to benefit his patients, and is trying to manipulate his status as an incidental beneficiary into that of a primary or intended beneficiary. Thus, Dr. Fobbs fails to state a claim under this theory.
 
 
 59
 Finally, Dr. Fobbs alleges that he is asserting his patients' and his potential patients' rights on their behalf. Like physician Doe in St. Joseph's Hospital, Dr. Fobbs seeks to represent his patients on the grounds that "discrimination against doctors imports discrimination against their patients (presumably the primary beneficiaries here)." 788 F.2d at 421. Dr. Fobbs alleges that his patients are intended beneficiaries of St. Agnes' federally funded programs, and that the hospital encourages doctors who do not take Medi-Cal or other uninsured patients to obtain and maintain staff privileges, while it discourages doctors who would admit Medi-Cal or uninsured patients into St. Agnes from obtaining and maintaining medical staff privileges. He alleges that a large percentage of these Medi-Cal and uninsured patients are minorities, and thus, St. Agnes' policy:
 
 
 60
 has the impact of restricting the amount of minority patients who utilize [St. Agnes].... It is alleged that Plaintiff Dr. FOBBS' patients and potential patients, approximately 60% of whom are members of a minority race will not be able to find a physician willing to admit them to [St. Agnes] because of the policies and practices complained of herein.
 
 
 61
 In St. Joseph's Hospital, the Seventh Circuit held that physician Doe did not establish third party standing to assert the rights of her patients, even where Doe's complaint invoked "the doctor/patient relationship and the obstacle to the patient raising their [sic] own rights (including their lack of resources and the uncertainty as to whether and when they might need hospitalization)." 788 F.2d at 421, n. 18.
 
 
 62
 Dr. Fobbs seeks to distinguish St. Joseph's Hospital on the ground that unlike Doe, Dr. Fobbs alleged that other physicians at St. Agnes could not admit his patients to St. Agnes, and that therefore, his patients cannot gain access to St. Agnes without Dr. Fobbs, or at the least, his patients are burdened in that they "will have more difficulty in securing admission to the hospital than will other patients."
 
 
 63
 We reject this theory for two reasons. First, Dr. Fobbs conceded to the district court that other doctors at St. Agnes may admit his patients and that St. Agnes does not totally exclude minority patients. Second, Dr. Fobbs has not explained why he, rather than his patients, should receive money damages for injury inflicted on his patients.[1] See United States General, Inc. v. City of Joliet, 432 F.Supp. 346, 351 (N.D.Ill.1977) ("[I]f [low income housing developer] plaintiff prevailed on the merits, it would obtain damages for itself and the minority group families would receive no benefit.... [P]laintiff lacks standing to bring this action solely as a result of the indirect relationship between it and the minority group families.").
 
 
 64
 We hold that Dr. Fobbs in his Title VI claim has sufficiently alleged personal racial discrimination, and the dismissal of the district court on that issue is reversed. However, his allegations of third party standing and discrimination against his patients are not valid, and the holding of the district court on those issues is affirmed.
 
 D. 42 U.S.C. Sec. 1985(3) Claim
 
 65
 42 U.S.C. Sec. 1985(3) provides a cause of action for damages where "two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws...."
 
 
 66
 The primary issue of this claim is whether a heightened pleading standard for civil rights cases as set forth in Frazier v. Southeastern Pa. Transp. Auth., 785 F.2d 65 (3d Cir.1986), is required. However, the Supreme Court has recently rejected heightened pleading standards under the Federal Rules of Civil Procedure for almost all claims except fraud and mistake. Leatherman v. Tarrant County Narcotics Intelligence and Coord. Unit, --- U.S. ----, ----, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993).[2]
 
 
 67
 The Court specifically noted that the imposition of any heightened pleading requirement must be made by amendment to Federal Rules 8 and 9, rather than by judicial interpretation. It stated that, "[i]n the absence of such an amendment, federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." Leatherman, --- U.S. at ----, 113 S.Ct. at 1163. Thus, the Leatherman standard applies to Sec. 1985 claims.
 
 
 68
 A sufficiently pleaded complaint "will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Id. (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 102-03, 2 L.Ed.2d 80 (1957)). Plaintiff must give " '[s]ome facts as to when, how, to whom, and with what results such discrimination has been applied.' " Grohal v. Stauffer Chemical Co., 385 F.Supp. 1267, 1268 (N.D.Cal.1974) (quoting Ogletree v. McNamara, 449 F.2d 93, 98 (6th Cir.1971)).
 
 
 69
 In this case, the district court found that while Dr. Fobbs alleged the requisite elements for conspiracy under Sec. 1985(3), these allegations were too broad and conclusory. See Canlis v. San Joaquin Sheriff's Posse Comitatus, 641 F.2d 711 (9th Cir.), cert. denied, 454 U.S. 967, 102 S.Ct. 510, 70 L.Ed.2d 383 (1981). Dr. Fobbs has alleged that (1) defendants entered into a conspiracy; (2) the purpose was to deprive himself and his minority patients of equal protection of the laws based on his race and the races of his patients; and (3) these acts deprived plaintiff of his rights and privileges as an American citizen.
 
 
 70
 In support of his conspiracy allegation, Dr. Fobbs has also pled that overt acts were done in furtherance of the conspiracy, including, inter alia: (1) attempts to limit or eliminate Dr. Fobbs' surgical privileges at defendant Medical Center; (2) the September 30, 1988 suspension of Dr. Fobbs' medical privileges; (3) attempts to cause the California State Board of Medical Quality Assurance ("CSBMQA") to take disciplinary action against Dr. Fobbs; (4) damage to Dr. Fobbs' practice and professional relationships by causing the CSBMQA to report the restrictions on Dr. Fobbs' privileges to numerous medical facilities and medical insurance carriers and the Texas State Board of Medical Examiners; (5) successful attempts to cause defendant St. Agnes Medical Center to take disciplinary action against Dr. Fobbs by making false accusations against him; (6) defamation of Dr. Fobbs' skill and qualifications as a physician and surgeon; and (7) interference with the granting and retention of full obstetric and gynecological and laser surgical privileges at St. Agnes, Fresno Community Hospital, Clovis Community Hospital and the Fresno Surgery Center.
 
 
 71
 The district court dismissed the claim because "the existence of a conspiracy and the roles of the various defendants in such a conspiracy remains obscure. It is unclear whether plaintiff claims he was discriminated against because of his race, that he was discriminated because of his patients' races, or that his patients were discriminated against because of their race." The district court appears to believe that plaintiff may legitimately allege only one theory of conspiracy. In evaluating a complaint, however, "any doubts should be construed in favor of the pleader." Gillespie v. Civiletti, 629 F.2d 637, 640 (9th Cir.1980). Construing the district court's doubts in Dr. Fobbs' favor, it seems that he is alleging all three theories that the court has identified; furthermore, Dr. Fobbs appears to also allege that his patients were discriminated against because of his race.
 
 
 72
 These theories of discrimination, coupled with Dr. Fobbs' catalog of defendants' allegedly discriminatorily motivated overt acts give defendants fair notice as to the specific acts which Dr. Fobbs contends demonstrate a conspiracy to interfere with his right and privilege to practice medicine based on his race and on the race of his patients.
 
 
 73
 Finally, defendants contend that (1) plaintiff is claiming discriminatory impact, rather than animus, (2) plaintiff has failed to identify the rights, privileges and immunities which he has been denied, (3) plaintiff has failed to demonstrate how he has been discriminated against because of his patients' races, and (4) plaintiff does not have standing to assert his patients' claims of race discrimination. The first three of these contentions lack merit.
 
 
 74
 First, Dr. Fobbs has alleged that defendants targeted him because of his race, not that defendants' actions had an adverse impact on him as a black man. See Johnson v. Greater Southeast Community Hosp. Corp., 951 F.2d 1268 (D.C.Cir.1991).
 
 
 75
 Second, Dr. Fobbs has identified the practice of medicine as a privilege under Article IV, Sec. 2 of the Constitution, see Supreme Court of New Hampshire v. Piper, 470 U.S. 274, 281, 105 S.Ct. 1272, 1277, 84 L.Ed.2d 205 (1985), and his right to be free from improper racial discrimination under the Fourteenth Amendment of the Constitution.
 
 
 76
 Third, Dr. Fobbs has presented a colorable claim that his privileges were restricted because he treated primarily patients of color.
 
 
 77
 Defendants are correct, however, with respect to Dr. Fobbs' standing to sue under Sec. 1985 on the claim that defendants conspired to racially discriminate against his patients. Where a physician seeks declaratory or injunctive relief, he has standing to bring action on behalf of patients who are members of a protected class for conspiracy to deprive the patients of equal protection of laws and equal privileges and immunities of national citizenship. See Cousins v. Terry, 721 F.Supp. 426, 428-29 (N.D.N.Y.1989). Cf. Haskell v. Washington Township, 864 F.2d 1266, 1274-76 (6th Cir.1988) (physician has standing to bring suit for equitable relief on behalf of his patients based on harm to his patients and has personal standing to bring suit for monetary relief based on harm to his financial interests). As discussed above with regard to his Title VI claim, Dr. Fobbs does not have standing to bring a suit on behalf of his patients, where he seeks money damages. See City of Joliet, 432 F.Supp. at 351.
 
 
 78
 Because Dr. Fobbs has stated a colorable claim of conspiracy, we reverse the district court's dismissal of his Sec. 1985(3) claim. However, the dismissal of those aspects of the claim alleging racial discrimination against Dr. Fobbs' patients is affirmed.
 
 II. CONCLUSION
 
 79
 The district court's grants of summary judgment on Dr. Fobbs' Sherman Antitrust Act and Sec. 1981 claims are AFFIRMED.
 
 
 80
 The district court's dismissals of Dr. Fobbs' Title VI and Sec. 1985(3) claims are REVERSED as to those parts which allege racial discrimination solely against Dr. Fobbs and AFFIRMED with respect to the allegations of discrimination against his patients.
 
 
 
 [1]
 The district court specifically questioned Dr. Fobbs' attorney on this point:
 THE COURT: "How is [Dr. Fobbs] entitled to collect anything for his patients being discriminated against? Because he loses money?"
 MR. WEISBERG: "Well, certainly there is the allegation that he has lost substantial amounts of money as a result of having lost his privileges."
 THE COURT: "No, now you are changing the subject on me again. You said he wants money because he didn't collect money because his patients couldn't go to that hospital."
 MR. WEISBERG: "That's correct."
 Reporter's Transcript May 7, 1990, p. 11.
 
 
 [2]
 In Leatherman, the Court was concerned solely with the issue of whether the federal courts may apply a heightened pleading standard to Sec. 1983 claims against municipalities. Nonetheless, the Court's analysis encompasses almost all claims subject to Federal Rules of Civil Procedure 8 and 9, as other federal courts have recognized. See Mid America Title Co. v. Kirk, 991 F.2d 417, 421 (7th Cir.) (Copyright Act, 17 U.S.C. Sec. 101, et seq.), cert. denied, --- U.S. ----, 114 S.Ct. 346, 126 L.Ed.2d 310 (1993); Warwick Administrative Group v. Avon Products, Inc., 820 F.Supp. 116, 120 (S.D.N.Y.1993) (CERCLA, 42 U.S.C. Sec. 9607(a)); Neal v. Honeywell, Inc., 826 F.Supp. 266, 268 (N.D.Ill.1993) (False Claims Act, 32 U.S.C. Sec. 3729, et seq.). Cf. Branch v. Tunnell, 14 F.3d 449 (9th Cir.) (justifying application of heightened pleading standard on the ground that the Supreme Court expressly declined to decide whether its "qualified immunity jurisprudence would require a heightened pleading in cases involving individual government officials." Id. at 456 (quoting Leatherman, --- U.S. at ----, 113 S.Ct. at 1162)), petition for cert. filed, 62 U.S.L.W. 3575 (1994)